# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 15-498

**STATE OF LOUISIANA**

**VERSUS**

**CEASAR JAMES WILLIAMS, a/k/a**
**CEASER JAMES WILLIAMS**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 32530-11
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## MARC T. AMY
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Marc T. Amy, and Shannon J. Gremillion, Judges.

**CONVICTIONS AND SENTENCES AFFIRMED WITH INSTRUCTIONS.**

**John F. DeRosier**
**District Attorney**
**Karen C. McLellan**
**Assistant District Attorney**
**Carla S. Sigler**
**Assistant District Attorney**
**Post Office Box 3206**
**Lake Charles, LA   70602-3206**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**Douglas Lee Harville**
**Louisiana Appellate Project**
**400 Travis Street, Suite 1702**
**Shreveport, LA   71101**
**(318) 222-1700**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Ceaser James Williams**

**Ceaser James Williams**
**Camp-D/Raven-2L**
**Louisiana State Penitentiary**
**Angola, LA   70712-9818**

**AMY, Judge.**

A jury found the defendant guilty of second degree murder, a violation of La.R.S. 14:30.1; aggravated criminal damage to property, a violation of La.R.S. 14:55; and aggravated battery, a violation of La.R.S. 14:34. Thereafter, the defendant was sentenced to life imprisonment at hard labor to be served without the benefit of probation, parole, or suspension of sentence for his second degree murder conviction; ten years at hard labor, with credit for time served, for his aggravated criminal damage to property conviction, to run consecutively to his second degree murder sentence and concurrently with his aggravated battery sentence; and ten years at hard labor for his aggravated battery conviction, to run consecutively to his second degree murder sentence. The defendant appeals. For the following reasons, we affirm the defendant's convictions and sentences, with instructions.

## Factual and Procedural Background

The State alleges that the defendant, Ceasar James Williams, a/k/a Ceaser James Williams, shot and killed Cory Demond Thomas, Sr., in the parking lot of the Sunlight Manor Apartments in Lake Charles, Louisiana, in the late hours of May 31, 2011. The State also alleges that one of the shots fired by the defendant went through the wall of one of the apartment buildings and struck Takisha Perry[1] in the foot. A grand jury indicted the defendant for second degree murder, a violation of La.R.S. 14:30.1, and aggravated criminal damage to property, a violation of La.R.S. 14:55. The State later amended the charges to include a charge of aggravated battery, a violation of La.R.S. 14:34.

---

[1] Ms. Perry was also referred to as "Takisha Reynolds" in the record.

After a trial, a jury returned guilty verdicts as to all three charges. The defendant filed motions for new trial and for judgment notwithstanding the verdict, which were denied. The trial court sentenced the defendant to life imprisonment at hard labor to be served without the benefit of probation, parole, or suspension of sentence for his second degree murder conviction; ten years at hard labor, with credit for time served, for his aggravated criminal damage to property conviction, to run consecutively to his second degree murder sentence and concurrently with his aggravated battery sentence; and ten years at hard labor for his aggravated battery conviction, to run consecutively to his second degree murder sentence. The defendant filed a motion to reconsider sentence, which was denied without a hearing.

The defendant appeals. In his counseled brief, the defendant asserts the following assignments of error:

> 1. The Trial Court erred when it granted the State's reverse-Batson challenges as to Lisa Griffith and Carla Hood.

> 2. There was insufficient evidence to prove that Ceasar James Williams was guilty beyond a reasonable doubt of second degree murder, aggravated criminal damage to property, or aggravated battery.

> 3. The Trial Court erred in imposing a sentence herein that is unconstitutionally excessive.

The defendant has also filed a brief in proper person, contending that:

> 1. The trial court erred in denying Mr. Williams' objection to the jury instruction as to [La.Code Crim.P.] art. 782 (non-unanimous verdict) in a case which carries a mandatory life sentence, in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

> 2. The trial court erred when it denied Mr. Williams' *Batson* challenges concerning the State's peremptory challenges of Ms. Rose and Ms. Picou; in violation of *Batson v. Kentucky*; Sixth and Fourteenth Amendments to the United States Constitution.

**Discussion**

*Errors Patent*

Pursuant to La.Code Crim.P. art. 920, this court reviews all criminal appeals for errors patent on the face of the record. After completing that review, this court notes two errors patent.

First, the record does not indicate that the trial court informed the defendant of the prescriptive period for filing an application for post-conviction relief, as required by La.Code Crim.P. art. 930.8. Accordingly, we direct the trial court to inform the defendant of the provisions of La.Code Crim.P. art. 930.8 by providing him with written notice within ten days of the date of this opinion and to file written proof in the record that the defendant received the notice. *See State v. Mitchell*, 13-426 (La.App. 3 Cir. 11/6/13), 125 So.3d 586, *writ denied*, 14-102 (La. 6/20/14), 141 So.3d 807.

Second, the sentencing minutes and commitment order require correction. The court minutes and commitment order both indicate that, with regard to the defendant's sentence for aggravated battery, "the first year" is "to be served without the benefit of probation, parole, or suspension of sentence[.]" However, the transcript of the defendant's sentencing hearing reveals that no such restriction was imposed. Where the transcript and the minutes conflict, the transcript prevails. *State v. Wommack*, 00-137 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. Therefore, we order the trial court to amend the minute entry from the defendant's sentencing hearing and the commitment order to reflect the sentence actually imposed for aggravated battery.

3

*Sufficiency of the Evidence*

The defendant also asserts that the evidence was insufficient to support his convictions. When a defendant asserts multiple assignments of error, including sufficiency of the evidence, the appellate court must first determine the sufficiency of the evidence. *State v. Williams*, 13-156 (La.App. 3 Cir. 10/16/13), 156 So.3d 688, *writ denied*, 13-2678 (La. 5/2/14), 138 So.3d 1245. This court reiterated the jurisprudence applicable to sufficiency of the evidence claims in *State v. Lively*, 13-883, pp. 8-9 (La.App. 3 Cir. 2/12/14), 153 So.3d 1061, 1067, *writ denied*, 14-755 (La. 1/16/15), 157 So.3d 1124, stating:

> The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La.7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville*, 448 So.2d 676 (La.1984)). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La.2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson*, 96-1048 (La.10/4/96), 680 So.2d 1165; *State v. Lubrano*, 563 So.2d 847 (La.1990)). The appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La.10/16/95), 661 So.2d 442.
>
> The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than insuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact[,]" but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270 (quoting *State v. Lambert*, 97-64 (La.App. 3 Cir. 9/30/98), 720 So.2d 724). Our supreme court has stated:
>
>> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall*, 523 So.2d 1305, 1310 (La.1988). In

4

> determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve " 'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.' " *McDaniel v. Brown*, 558 U.S. [120], [134], 130 S.Ct. 665, 674, 175 L.Ed.2d 582 [ (2010) ] (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville*, 448 So.2d 676, 680 (La.1984).

*State v. Strother*, 09-2357, pp. 10-11 (La.10/22/10), 49 So.3d 372, 378.

Where the key issue is not whether a crime was committed, but whether the defendant is the perpetrator, the State is required to negate any reasonable probability of misidentification. *State v. Neal*, 00-674 (La. 6/29/01), 796 So.2d 649, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323 (2002). "However, positive identification by only one witness is sufficient to support a conviction." *Id.* at 658.

The defendant was charged with second degree murder, a violation of La.R.S. 14:30.1; aggravated battery, a violation of La.R.S 14:34; and aggravated criminal damage to property, a violation of La.R.S. 14:55. As relevant herein, the crime of second degree murder "is the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm[.]" La.R.S. 14:30.1(A). A finding of specific intent to kill may be supported by a determination that the perpetrator deliberately pointed and fired a weapon at the victim at close range. *State v. Thomas*, 10-806 (La.App. 3 Cir. 4/27/11), 63 So.3d

5

343, *writ denied*, 11-963 (La. 10/21/11), 73 So.3d 382. Aggravated battery is defined as "a battery committed with a dangerous weapon." La.R.S. 14:34(A). A "dangerous weapon" is defined in La.R.S. 14:2(A)(3) as including "any gas, liquid or other substance or instrumentality, which, in the manner used, is calculated or likely to produce death or great bodily harm." Whether an instrument is dangerous because of its use is a question of fact for the jury to decide. *State v. Catlin*, 09-220 (La.App. 3 Cir. 11/4/09), 24 So.3d 264. Finally, "[a]ggravated criminal damage to property is the intentional damaging of any structure, watercraft, or movable, wherein it is foreseeable that human life might be endangered, by any means other than fire or explosion." La.R.S. 14:55(A). Firing a handgun into an occupied apartment complex has previously been determined to constitute aggravated criminal damage to property. *See State v. Teno*, 12-357 (La.App. 3 Cir. 11/7/12), 101 So.3d 1068, *writ denied*, 12-2652 (La. 5/17/13), 117 So.3d 510.

The State presented evidence, including the testimony of several witnesses, at trial. One of the victims, Takisha Perry, testified that on May 31, 2011, she was living in the Sunlight Manor apartment complex. According to Ms. Perry, she was in the parking lot with a friend when she heard a gunshot. She saw several people running, and, when she heard more gunshots, she and her friend started running back to Ms. Perry's apartment. Ms. Perry testified that she saw a man running, and a man chasing after him firing a gun. Ms. Perry did not recognize either the shooter or the man he was chasing after. According to Ms. Perry, she did not see the shooter's face, but he was a skinny, black male who was approximately 5'7" or 5'8" and had a "low haircut." Ms. Perry testified that the shooter had on a white t-shirt with some sort of graphic, blue jean pants, and a belt with rhinestones "or

6

something" on it. Ms. Perry stated that she could not see what kind of gun the shooter had.

After Ms. Perry shut the door to her apartment, she said that she "looked down and it looked like a firecracker or something, and uh, it shot me in my foot." Ms. Perry testified that she was hit on the heel of her left foot by a shot that came through the wall of her apartment. Ms. Perry was later treated at the hospital, and a bullet was recovered from her foot and taken into evidence.

Although Ms. Perry could not remember dialing 911, Sergeant Franklin Fondel of the Lake Charles Police Department testified that the police received a 911 call from her. According to Sergeant Fondel, while the responding officers were on their way to Ms. Perry's apartment, they were flagged down because there was another victim, Cory Demond Thomas, Sr. who was lying on the sidewalk. Both Ms. Perry and Mr. Thomas were transported to the hospital. However, Mr. Thomas was declared dead shortly after midnight on June 1, 2011.

An autopsy subsequently revealed that Mr. Thomas suffered multiple gunshot wounds: one to the face, one to the back, and one to his side. The forensic pathologist, Dr. Terry Welke, testified that the wound to Mr. Thomas's back was fatal because it injured Mr. Thomas's right lung and that the wound to Mr. Thomas's face could have been fatal if it were not treated. Dr. Welke also testified that he recovered a bullet from Mr. Thomas's jaw.

Sergeant Fondel testified that the police learned that Mr. Thomas had been in one of the Sunlight Manor apartments with a woman named Sheena, and that Mr. Thomas had been seen walking downstairs from one of the apartments to a green Honda CRV that was backed in next to a dumpster. According to Sergeant Fondel's testimony, other investigators located a projectile near the dumpster.

7

There was subsequent testimony from Patrick Lane, an expert firearm examiner with the Louisiana State Police. Mr. Lane testified that he examined two bullets, one recovered from the Sunlight Manor Apartments and the other from one of the victims. Mr. Lane testified that the recovered bullets were .38 caliber bullets that could have been fired from either a .38 special revolver or a .357 magnum revolver, and that both bullets were fired from the same unknown firearm.

Further, Sergeant Fondel testified that he received an anonymous phone call indicating that the green CRV belonged to Tracey Williams, who lived with his girlfriend, Ebony Porterfield, on Rose Street. There was later testimony establishing that Tracey and the defendant are first cousins. The CRV was located at Ms. Porterfield's residence on Rose Street. At that time, Ms. Porterfield was home, but Tracey was not. Tracey was subsequently dropped off at the residence, and both he and Ms. Porterfield were taken to the police station for interviews.

Sergeant Fondel also testified that another detective, Detective Farquhar, received an anonymous phone call identifying the defendant as the shooter. The anonymous caller also indicated that the defendant was with a woman named Jasmine Carroll in a blue Chevrolet Cobalt. Shortly thereafter, the police located Ms. Carroll's vehicle and she was stopped by the police. However, the defendant was not in the vehicle with Ms. Carroll.

According to Ms. Carroll's testimony, the defendant was walking on the street when she picked him up at 5:00 or 6:00 a.m. on June 1, 2011. The two of them drove around "smoking" until one of her friends called her and told her to "[g]et out of the car." Ms. Carroll testified that she did not know exactly what had happened and did not ask her friends because she was high and afraid of "flipping out." Ms. Carroll told the defendant that she needed to run an errand, and he asked

her to drop him off at the Third Street apartments. Shortly thereafter, she was stopped by the police. Ms. Carroll testified that she showed the police where she dropped the defendant off.

Sergeant Fondel testified that the police determined that the defendant was in an apartment leased to Shaneeka Lavergne.[2] Ms. Lavergne testified that she previously lived at the apartment on Third Street with her girlfriend, India Williams. Ms. Lavergne testified that she knows Tracey and the defendant because India Williams is related to both of them. According to Ms. Lavergne, she was not living at the apartment on June 1, 2011, but Tracey had been staying there after a fight with his girlfriend. She testified that Tracey had a key to the apartment. Ms. Lavergne also testified that the police contacted her and that she gave them permission to enter her house.

Sergeant Fondel testified that after obtaining Ms. Lavergne's permission to search the apartment, the police entered the apartment, located the defendant inside, and arrested him. Sergeant Fondel testified that, at the time the defendant was taken into custody, he was wearing a white t-shirt, blue jean shorts, and some red, white, and black tennis shoes.

Sheena Leday testified that because of her association with Tracey, she knew the defendant, who she identified as "Little C." On May 31, 2011, Ms. Leday was visiting someone named Damon in the Sunlight Manor Apartments, and that Mr. Thomas was at the apartment. According to Ms. Leday, she and Damon were "getting high" on "wet," i.e., cigarettes dipped in PCP,[3] which they got from

---

[2] Ms. Lavergne's name is also spelled as "Shakeena" in the record.

[3] Dr. Welke testified that phencyclidine is also known as PCP and that:

Mr. Thomas.  Ms. Leday testified that the drug can cause "[l]oss of memory [and] hallucinations," but that she was able to recall the events of that evening.  Ms. Leday's testimony was that:

> [Ms. Leday] On the day before I did not see Ceaser.
>
> [The State]  Okay.
>
> A    The day of the murder, yes, I did.
>
> Q    So, you did?
>
> A    Yes, ma'am.
>
> Q    If you can remember, tell me where you saw him all the times you saw him.
>
> A    The only time I saw him was when they came over before the incident happened.
>
> Q    Tell me about that. When who came over where?
>
> A    Tracey and Ceaser came up to the apartment.  All I remember was they backed in, and --
>
> Q    Now, when you say they came up to the apartment, did they walk up? They walked to Damon's apartment?
>
> A    They did not go up to the apartment.
>
> Q    Okay.
>
> A    They stayed inside the vehicle, and I -- I -- Cory got a -- I think Cory got a call and said they was here to make a sale. He was going to sell them some wet.
>
> . . . .
>
> Q    Okay. So, we were talking about Ceaser and Tracey pulling up to the apartment complex. How did you know they were outside? Where were you?
>
> A    I was sitting in the apartment. I knew they was outside. Cory walked downstairs. Something just told me to follow him, and I followed him down the stairs. He walked up to the vehicle, and I did, too. I was on the driver's side talking to Tracey. And, the

---

PCP is actually an animal tranquilizer, and individuals have a tendency to dip it or mix it with marijuana and smoke it to either get a high.  Sometimes it causes disorientation, even can cause sleepiness or sometimes loss of coordination depending on how much you use and how often it's been used.

last words he told me was, "Get away from the vehicle," and I walked away. I turned my back and I heard gunshots.

Ms. Leday testified that Tracey was driving a "green Jeep," and that the defendant was in the front passenger seat. She also testified that Mr. Thomas was sitting behind Tracey on the driver's side of the vehicle. Ms. Leday also admitted that she did not say anything to the police about turning her back when she gave her initial statement.

Ms. Leday's videotaped statement was played for the jury for impeachment purposes, and both the video and a transcript of the statement were introduced into evidence. As reflected in the transcript of that statement, Ms. Leday stated that Tracey picked her up after the shooting and gave her money for a hotel room. However, when questioned about whether it was Tracey or the defendant who shot Mr. Thomas, Ms. Leday stated "I don't know. I really don't know." In her trial testimony, Ms. Leday stated that she believed Tracey gave her money for a hotel room, because she "knew what was going on. And, he tried to put me there so the cops wouldn't find me to question me."

Tracey Williams' ex-girlfriend, Ebony Porterfield, also testified. According to Ms. Porterfield, Tracey was living with her in May of 2011. Ms. Porterfield testified that she had two vehicles—a 2007 Dodge and a green 1997 Honda CRV and that Tracey primarily drove the green CRV. On May 31, 2011, Tracey was not at the house when she went to bed at 8:30 or 9:00 p.m. Ms. Porterfield testified that she next heard from Tracey "after 11:00" when he woke her up. According to Ms. Porterfield, Tracey "burst into the room kind of hysterical" and told her "My cousin, Little C, shot that man. I think he killed that man." Ms. Porterfield identified "Little C" as the defendant.

11

According to Ms. Porterfield, shortly after Tracey made that statement, he borrowed her cell phone and made a phone call in another room. Although Ms. Porterfield testified that she could not hear the other side of the conversation, she recalled that she heard Tracey "talking about he was wrong for what he did, you know." When the State asked Ms. Porterfield "[w]ho was wrong for what they did," Ms. Porterfield responded, "C." Ms. Porterfield testified that Tracey left again, but that he left the green CRV and took the Dodge that she normally drove. Soon after this, Ms. Porterfield was contacted by Sergeant Fondel and taken to the police station for an interview.

In addition to this testimony, Ms. Porterfield stated that Tracey had a handgun in the house. Although Ms. Porterfield could not identify exactly what type of gun it was, she testified that it was "like from the Western stuff, the kind, you know, with the rot[o]r" and, when asked to identify the type of gun she saw Tracey with from a "gun lineup," she identified a .357 Colt Python revolver. Mr. Lane, the firearms examiner, when discussing the firearms that would be consistent with the bullets located at the scene, testified that the photo Ms. Porterfield circled generically "very adequately describes what those guns would look like."

Ms. Porterfield also testified that she had heard Tracey threaten to shoot someone, but never to kill them, and that there were domestic violence incidents between them. Further, Ms. Porterfield could not remember what clothing Tracey was wearing the night of the shooting, and was not sure if he changed clothes when he returned home. Ms. Porterfield also recalled that Tracey had a "low haircut."

The defendant's girlfriend, Mardell Lebleu, testified. Ms. Lebleu testified that on May 31, 2011, she was home with her son, her aunt, and her aunt's children at approximately 11:00 p.m. According to Ms. Lebleu, she did not see the

12

defendant that night.  However, Ms. Lebleu testified that she had twelve missed calls on that day.  Although the calls were not from the defendant's phone number, when she finally answered the phone, "Ceaser was on the other end of the phone." Ms. Lebleu testified that she could not "remember exactly what we talked about because I was half asleep when I answered the call.  And, I just remember him saying, 'I love you,' and he was telling me some other stuff, but I don't remember briefly, you know."

After refreshing her recollection, Ms. Lebleu testified about her conversation with the defendant as follows:

> [Ms. Lebleu]   Whenever I told him I couldn't hear I hung up the phone because I was in a dead sleep. I just hung up the phone. I thought it was a dream or whatever. And, whenever he called back I answered, and I was like, "Hello. Hello." And, he was just like, "What you doing?" I was like, "I'm sleeping. I've got to go to work in the morning." He was like, "Well, if anybody asks, I was with you." I was like, "Yeah, whatever." And, he was like, "I had on this. I had on that," and I was like, "Okay, yeah, whatever." I hung up the phone. I gotta go to work.

> [The State] What did he say he had on?

> A     A red shirt, blue pants and some red shoes.

> Q     Red shirt; is that what you just said?

> A     Yes, ma'am.

> Q     Okay. You want to take a look at your statement and see if that's accurate and what you told Detective Fondel? What did he say?

> A      A white shirt instead of red.

> Q      A white shirt?

> A      Yes, ma'am.

> Q      A white shirt and --

> A      Blue jean pants and a red shirt. Blue pants and a red shirt, and red shoes, I mean.

Ms. Lebleu stated that she did not know why the defendant would ask her to tell anyone that he was with her that night.

Tracey Williams also testified. Tracey initially refused to take the oath to testify truthfully, on the basis that his "statement wasn't true on the video statement." However, he ultimately affirmed to tell the truth. Tracey testified that the defendant is his first cousin, and that they were "close like brothers."

Tracey's testimony was that he was at the Sunlight Manor Apartments on May 31, 2011, and that he was driving the green CRV. Tracey testified that he bought "wet" from Mr. Thomas on more than one occasion that day. Tracey admitted that he was at the Sunlight Manor Apartments at about 10:30 or 11:00 p.m. to buy another cigarette from him. He denied that anyone else was in the vehicle with him at that time, and denied seeing the defendant at the Sunlight Manor Apartments.

When the State asked Tracey if viewing his video statement to the police would refresh his memory, Tracey stated, "I told you I lied on my video statement and my statement." The State read from Tracey's statement that the defendant was "over there." Tracey testified that he told the police that "because like I was scared and I was ready to go home because he kept me and my baby mama in there for a long time. So, I just said what he wanted me to say, what he had been asking me to say." Tracey claimed that he was scared and high, and that Sergeant Fondel, who was conducting the interview "wanted [him] to tell it on" the defendant.

The State played Tracey's videotaped statement for the jury, with redactions, and a copy of the video and a transcript were entered into evidence. Therein, Tracey admitted immediately that he smoked "sherm," and that he met up with Mr.

Thomas in order to buy a cigarette, or "clickem juice."[4] Tracey stated that he went back a second time to get another cigarette from Mr. Thomas and "Ceas[e]r was over there, sir. Ceas[e]r was over there. I don't know the name of them apartments. It's behind Church's." Tracey later stated that the defendant was wearing a "big" camouflage hat and a plain white t-shirt.

Tracey then stated that he left, and came back to buy another cigarette from Mr. Thomas, and that:

> It wasn't even about ten minutes – ten minutes passed. . . . I was – I was parked by the dumpster, and Cory came to meet me. And me and Cory, he was – he was giving me another cigarette. . . .
>
> And then all of a sudden . . . there was a female I was talking to. I don't – I forget her name, but me and her supposed to be kin. . . .
>
> And me and her was talking while Cory was in my car. . . . He was trying to do my cigarette, dunk my cigarette for me.
>
> And then all – all we heard was: Give it up, n****r. And then we heard a shot. And he say: I'm shot. I'm shot.

Tracey claimed that he did not know at that time that the shooter was his cousin, and that he learned later that the "word to the streets" was that it was the defendant. According to Tracey, there was no one else in the vehicle with him when he met Mr. Thomas the third time. He stated that Mr. Thomas was on the passenger side of his vehicle with the door open when the first shot occurred and that Mr. Thomas took off running. Tracey then stated:

[Tracey]    When I seen the dude, I seen the guy with the gun –

[Sgt. Fondel] What guy was that?

A.    That's the guy with that – with the big hat.

Q.    And who was that?

---

[4] Although there was other testimony that Mr. Thomas was selling cigarettes dipped in PCP, Tracey testified that "wet" was also known as "wet formaldehyde" and that the cigarettes were dipped in embalming fluid.

A. It was Ceas[e]r. It was Ceas[e]r.

Q. And when you say "Ceas[e]r," Ceas[e]r who?

A. Ceas[e]r Williams.

. . . .

And Cory jump out the car and Cory started running. And then a gunshot went off and Cory say: He shot me. And Cory kept running. And he ran after him, sir. He ran behind him, and shot him, sir.

Tracey also stated:

Q. Okay. So when you looking and you seen him running after Cory, who you recognize running after Cory?

A. My cousin, sir, Ceas[e]r.

Tracey said there were two men running after Mr. Thomas, and that the other man was "telling him, shoot him." Tracey also said that he saw enough of the shooter's gun that he "wanted to say" it was an automatic, not a revolver. Further, Tracey stated that he "went straight home" and told "[his] girl" that he was going to get the defendant to turn himself in, and that he tried to get in touch with the defendant, but was unable to.

In addition to Tracey's videotaped statement, the State introduced a copy of a photographic lineup wherein he identified the defendant as the perpetrator and, in the section asking him to "indicate why you chose the photograph of the subject," wrote, "I seen Ceaser Williams point the gun at Corey and pull the trigger then I jumped in my car and pulled off." Tracey admitted that he identified the defendant in the photographic lineup but, "like I said, my statement -- my video statement wasn't true."

Tracey testified that the shooter did have a big hat, but that it was not the defendant. He also testified that he had been at the police station since 2:00 a.m.

16

and that his statement was taken at 7:00 a.m., and that he was concerned that he was going to be charged as the getaway driver. Tracey also explained that his statements to Ms. Porterfield that the defendant shot Mr. Thomas were because that was "what the streets told me, that they were looking for me and Ceaser because Ceaser had shot somebody."

Tracey denied that he shot Mr. Thomas.

Sergeant Fondel later testified that, although the videotape indicated that Tracey had been at the station since 3:00 a.m., he thought that was a mistake because the police did not pick Tracey up until about 4:30 a.m. and he did not arrive at the station until "5:00 – something."

The State also introduced the defendant's videorecorded statement. As reflected in the transcription of that statement, the defendant denied being at the Sunlight Manor Apartments. He claimed that he was "with [his] girl[,]" Mardell, at her house, from about 8:00 p.m. until 1:00 a.m. After that, the defendant said that he left and went to his cousin's house to sleep. The defendant also denied seeing Tracey the night before. When the detectives told the defendant that Ms. Lebleu denied seeing him on the night of the 31st, the defendant maintained his assertion that he was with Ms. Lebleu that night. However, after the detectives brought Tracey into the interview room, where he told the defendant in person that he had seen him the night before, the defendant stated that he had seen Tracey in his "green Jeep" at the park in Fisherville, and that he had gone to the Sunlight Manor Apartments earlier to buy a "cold cup."

The transcript of the defendant's statement also indicates that the police also let Tracey into the interview room a second time. Tracey talked about being a

father to his children and that he was afraid the police were trying to charge him, and that he needed to "stay out."

The defendant's argument is essentially that the State failed to prove the defendant's identity as the perpetrator because the only positive identification to that effect was unreliable. The defendant points out that Tracey was the only witness who identified the defendant as the shooter; however, Tracey recanted his videotaped statement at trial and asserts that Tracey "had reason to falsely name [the defendant] as the shooter[.]" The defendant contends that Tracey "needed someone to blame other than himself."

Having reviewed the testimony and evidence presented at trial, we conclude that there was sufficient evidence, when viewed in the light most favorable to the prosecution, to support the defendant's convictions for second degree murder, aggravated battery, and aggravated criminal damage to property. There was testimony that Mr. Thomas was at the Sunlight Manor Apartments when he was shot, and that he was seen running from a man who was firing a gun at him. Other testimony established that Mr. Thomas died from the gunshot wounds he sustained. Further, Ms. Perry's testimony established that shortly after she saw the perpetrator firing a gun at the person she later learned was Mr. Thomas, a bullet came through the wall of her apartment and hit her in the foot.

Thus, in this matter, the primary issue is not whether the crime occurred, but whether the State established that the defendant was the perpetrator of the crime. Although the State is required to negate any reasonable possibility of misidentification, the testimony of one witness is generally sufficient to establish the identity of the perpetrator. *Neal*, 796 So.2d 649. Although Tracey recanted his videotaped statement at trial, the statement itself wherein he identified the

18

defendant as the shooter was played for the jury and was available for them to consider as substantive evidence. As the finder of fact, the jury was free to reject Tracey's recantation and to accept his videotaped statement that the defendant was the shooter.

The State offered other circumstantial evidence that, if accepted by the jury, supported Tracey's initial identification of the defendant as the perpetrator, such as Ms. Leday's testimony that she saw the defendant when the shooting occurred, supports a conclusion that the defendant was present at the scene of the crime. Further, the State offered Ms. Porterfield's testimony that Tracey hysterically told her that "[m]y cousin, Little C, shot that man. I think he killed that man[,]" which if credited by the jury, tends to support the veracity of Tracey's videotaped statement and not his later recantation.

Additionally, the State offered evidence as to the defendant's own actions that, if accepted by the jury, suggest guilt. In his interview, the videotape of which was played for the jury and a transcript of which was placed into the record, a the defendant initially denied that he was present at the Sunlight Manor Apartments on the day of the shooting, but when confronted by the police and Tracey, admitted that he was there. In that same statement, the defendant asserted that he was with his girlfriend, Ms. Lebleu, on the evening of the shooting. However, Ms. Lebleu denied that the defendant was with her on the evening of the shooting and testified that the defendant contacted her shortly after the crime occurred and asked her to establish a false alibi for him.

Thus, we conclude that there was sufficient evidence, when viewed in the light most favorable to the prosecution, for a reasonable juror to find proof beyond a reasonable doubt of the elements of second degree murder, aggravated battery,

and aggravated criminal damage to property. Additionally, we conclude that there is sufficient evidence, when viewed in the light most favorable to the prosecution, that a reasonable juror could find that the State negated every reasonable possibility that the defendant was not the perpetrator. We note that, although there were inconsistencies in the testimony, the jury was the finder of fact, and it was within the jury's purview to resolve those inconsistencies.

Accordingly, we conclude that there was sufficient evidence to support the defendant's convictions. This assignment of error is without merit.

*Voir Dire / Batson Issues*

The defendant asserts, in his counseled brief, that the trial court erred in granting the State's "reverse-*Batson*" challenges as to two members of the jury venire, Jurors Griffith and Hood. In his brief in proper person, the defendant contends that the trial court erred in denying his *Batson* challenge as to the State's challenges of Jurors Rose and Picou. As they both concern the trial court's application of *Batson*, we address these assignments together.

> In *Batson* [*v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986)], the United States Supreme Court held that the use of peremptory challenges to exclude persons from a jury based on their race violates the Equal Protection Clause. *Batson*, 476 U.S. at 96-98, 106 S.Ct. 1712. The holding in *Batson* was initially adopted by this Court in *State v. Collier*, 553 So.2d 815 (La.1989), and has been codified by the legislature in Louisiana Code of Criminal Procedure article 795(C) and (D). While *Batson* discussed a prosecutor's use of peremptory challenges, its holding is equally applicable to criminal defendants. *See*, *Georgia v. McCollum*, 505 U.S. 42, 59, 112 S.Ct. 2348, 2359, 120 L.Ed.2d 33 (1992). The Court in *McCollum* specifically held "the Constitution prohibits a criminal defendant from engaging in purposeful discrimination on the ground of race in the exercise of peremptory challenges." 505 U.S. at 59, 112 S.Ct. 2348. Further, in *State v. Knox*, this Court considered whether the State may successfully object during voir dire to a minority defendant's alleged racially discriminatory exercise of peremptory challenges. 609 So.2d 803 (La.1992). We applied *McCollum* to hold that the State may invoke *Batson* where a black criminal defendant exercises peremptory

20

challenges against white prospective jurors. *Id.* at 806. An accusation by the State that defense counsel has engaged in such discriminatory conduct has come to be known as a "reverse-*Batson*" challenge.

The Court in *Batson* outlined a three-step test for determining whether a peremptory challenge was based on race. Under *Batson* and its progeny, the opponent of a peremptory strike must first establish a prima facie case of purposeful discrimination. Second, if a prima facie showing is made, the burden shifts to the proponent of the strike to articulate a race-neutral explanation for the challenge. Third, the trial court then must determine if the opponent of the strike has carried the ultimate burden of proving purposeful discrimination. *Batson*, 476 U.S. at 94-98, 106 S.Ct. 1712. *See also*, *Johnson v. California*, 545 U.S. 162, 168, 125 S.Ct. 2410, 2416, 162 L.Ed.2d 129 (2005); *State v. Sparks*, 1988-0017 (La.5/11/11), 68 So.3d 435, 468; *State v. Givens*, 99-3518 (La.1/17/01), 776 So.2d 443, 448.

*State v. Nelson*, 10-1724, 10-1726, pp. 7-9 (La. 3/13/12), 85 So.3d 21, 27-29 (footnotes omitted). "To establish a prima facie case, the objecting party must show: (1) the striking party's challenge was directed at a member of a cognizable group; (2) the challenge was peremptory rather than for cause; and (3) relevant circumstances sufficient to raise an inference that the peremptory was used to strike the venireperson on account of his being a member of that cognizable group." *Id.* at 29. Once a prima facie case has been established, the burden shifts to the striking party to articulate race-neutral reasons for their use of peremptory strikes. *Id.* The explanation need not be persuasive, or even plausible, but must be more than a "mere affirmation of good faith" or assumption that the challenged juror would be partial to the striking party because of their shared race. *Id.*

In *Nelson*, 85 So.3d at 32, with regard to step three of the *Batson* analysis, the supreme court stated:

the court must then determine whether the objecting party has carried his burden of proving purposeful discrimination. *Miller-El v. Dretke*, 545 U.S. 231, 125 S.Ct. 2317, 2331-32, 162 L.Ed.2d 196 (2005); *Batson*, 476 U.S. at 98, 106 S.Ct. 1712. This final step involves evaluating "the persuasiveness of the justification" proffered by the

21

striking party, but "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." [*Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771 (1995)].

In *Purkett*, the Supreme Court warned against "combining *Batson*'s second and third steps into one, requiring that the justification tendered at the second step be not just neutral but also at least minimally persuasive." *Purkett*, 514 U.S. at 768, 115 S.Ct. 1769. Instead, the Court noted "[i]t is not until the third step that the persuasiveness of the justification becomes relevant--the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful." *Id*. The Court explained that blurring the *Batson* stages can impermissibly shift the burden onto the proponent of the strike:

> But to say that a trial judge may choose to disbelieve a silly or superstitious reason at step three is quite different from saying that a trial judge must terminate the inquiry at step two when the race-neutral reason is silly or superstitious. The latter violates the principle that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.

*Id*.

Further, the trial court's evaluations of discriminatory intent are owed great deference and should not be reversed by an appellate court unless they are clearly erroneous. *State v. Allen*, 03-2418 (La. 6/29/05), 913 So.2d 788, *cert. denied*, 547 U.S. 1132, 126 S.Ct. 2023 (2006).

With regard to the State's "reverse-*Batson*" challenge, the defendant argues that the trial court inappropriately combined steps two and three of the *Batson* analysis and inappropriately shifted the burden to the defense. Further, the defendant asserts that the State did not establish purposeful discrimination.

The record reflects that the trial court found that the defendant had exercised six peremptory challenges, all as to white venirepersons. The trial court determined that this was a prima facie case of discrimination, and requested a race-

neutral explanation for each strike. However, the trial court noted that the defendant had unsuccessfully challenged two venirepersons, Jurors Kingham and Marcantel, for cause, before exercising peremptory strikes as to those venirepersons. Accordingly, the trial court noted that the defense had already offered race-neutral explanations for those two peremptory challenges.

With regard to Juror Hollingsworth, the defense offered the following explanation:

> "Okay. As to Juror 178, the reason I might have preferred her, being a person from DeQuincy, and I thought about that. But, what we got from her on questioning her is that she doesn't understand this process. She -- it kind of makes her head hurt to think about it. She didn't use those particular words. But, my perception was that she would be a follower and probably a person -- the kind of juror that I called the tenth juror; when they have nine that agree on one thing and trying to persuade the other three to join to create a majority verdict so that they can all go to the house or wherever that she would probably be that sort of person.

> She seemed uncomfortable, didn't know enough to make a decision on a person's life. That actually kind of cuts to the State. But, she just didn't have confidence. She has two children that she would rather be with. And, those were my reasons.

With regard to Juror Landreneau, the defense offered the following explanation:

> Mr. Landreneau is -- he had two in-laws who died of drug overdoses, and I think that that is something that went into our calculus that we have written notes on at this point. Also, I noted from him and I questioned him about this on the record about his work. He is a person -- he is a -- I think it's a process supervisor. People that hold high supervisory positions at the plants I find tend to become forepersons, and I tend to avoid them on my juries.

With regard to Juror Hood, the following colloquy occurred:

MR. ALEXANDER:

> Ms. Hood was too quick to say to Ms. Hawkins that, "If you were the prosecutor, would you want me on your jury?", "Yes," very emphatically. And then, when I came back with the

23

question, "How about if it were the Defense?" there wasn't near as much enthusiasm there. That's really the problem that I had with Ms. Hood.

THE COURT:

So, just the tone of her voice?

MR. ALEXANDER:

Well, she seemed overly anxious to be on the jury and she seemed to characterize herself as a person who would be a good juror for the prosecution.

. . . .

I can say more if you don't think that is enough.

THE COURT:

If you have more, you need to give it to me.

MR. ALEXANDER:

Well, I don't know how old she is, but she perceived to me as young, and I thought she would also be a follower, and that she would tend to follow. If they were building toward conviction, she would be one that would tend to follow on that.

With regard to Juror Griffith, the defense offered the following explanation:

Ms. Griffith seemed uncomfortable when I was asking her questions. She would frown and kind of knit her brow. I'm tying [sic] to remember what the questions were that I asked. Oh, yeah, I was asking her, "You have two sons, and so sometimes you've had to settle factual disputes on when they're making allegations against each other," and she was evasive about the question initially by saying, "Well, you know, they're grown up now." And so, then I had to come back and say, "Okay, but at one time they were young and you must have had those issues then. We all know that everybody does." And she still kind of wanted to fight the hypothetical. I had a real sense of uncooperation from her just in the process of trying to vet her as a juror, and just a suspicion toward the Defense table from her. Regardless of race, anybody that gives me that, I'm going to exercise a peremptory if I have peremptories to exercise.

The trial court then offered the State an opportunity for argument. The State contended that the defendant's attorney had offered "the most basic race-neutral

24

reasons he could come up with[.]" The State also argued that defense counsel's credibility was questionable with regard to his race-neutral explanations, given defense counsel's earlier comments to the venire about "arguments or suggestions in the form of statements regarding making sure the defendant had a jury of his peers" and actions in "immediately challenging any African-American that was struck by the State or stricken by the State while systematically striking white jurors when arguably there are others on the jury who exhibit the same facts or circumstances where they live, work, or expressions they made, and he didn't strike those individuals."

Defense counsel implied that the State's argument was "preposterous" and denied that he made any challenges on a racial basis. Thereafter, the trial court found that the defense offered race-neutral explanations for peremptory challenges as to the two venirepersons previously challenged for cause, Jurors Kingham and Marcantel, and as to Jurors Hollingsworth and Landreneau. However, with regard to Jurors Hood and Griffith, the trial court found that:

> Ms. Hood, with regard to thinking that she would be a follower, thought that her response to the State was greater than the response to the Defense. Her answers were totally neutral based on the Court's review. I disagree with the defense evaluation and the fact that thinking she would be a follower. She seemed to have opinions, seemed to be a strong-willed individual, and seemed to be fair and impartial in all of her responses. I do find that that was a pretext for her elimination.

> Under Lisa Griffith, Juror 146, that she was uncooperative, frowned, I found that she was deliberative in her thought process, wanting to give adequate responses. I do not find that there was a race-neutral reason given for her responding. She was cooperative. The fact that she made delayed responses only indicated the seriousness of the matter in the responses that she wanted to be reflective of her position. I find that she was also a pretext for elimination.

Accordingly, the trial court ordered Jurors Griffith and Hood returned to the jury venire.

Having reviewed the record, we conclude that although the trial court could have more clearly delineated the three steps of the *Batson* analysis, the trial court did not inappropriately blur the three steps of the *Batson* analysis such that the burden of persuasion impermissibly shifted to the defendant, i.e. the striking party. *See Nelson*, 85 So.3d 21. This court has previously determined that the trial court erred in impermissibly shifting the burden of proof to the defendant where the trial court rejected a defendant's race-neutral reasons "without requiring the State to prove purposeful discrimination." *State v. Bourque*, 12-1358 (La.App. 3 Cir. 6/5/13), 114 So.3d 642, *writ denied*, 13-1598 (La. 3/14/14), 134 So.3d 1187. However, in this matter, the record shows that the trial court required the State to rebut the defendant's proffered race-neutral explanations, and the trial court made a finding that the defendant's reasons as to Jurors Hood and Griffith were pretextual.

Accordingly, we find no error on the part of the trial court in granting the State's "reverse-*Batson*" motion.

The defendant also asserts a second *Batson* argument—that the trial court erred in denying his *Batson* challenges as to Jurors Rose and Picou. The defendant contends that the trial court dismissed his *Batson* challenges as to these two venirepersons by erroneously finding that a prima facie case of discrimination had not been proven.

However, our review of the record indicates that Juror Rose was accepted as a juror in this matter. The transcript concerning Juror Rose's acceptance onto the jury is somewhat confusing. However, it reflects that Juror Rose was accepted as a

26

juror, while Juror No. 285, Juror Payne, was excused. Accordingly, we will address the defendant's argument as to Jurors Payne and Picou.

The defense asserted a *Batson* challenge as to the State's exercise of a peremptory challenge with regard to Juror Payne. However, noting that the State had used two peremptory strikes at that time—one as to a white juror and one as to an African-American juror, the trial court found that a prima facie case of discrimination had not been shown at that time. Thereafter, the State exercised a peremptory challenge with regard to Juror Picou, and the defendant asserted a second *Batson* challenge. The trial court denied the defendant's challenge a second time. The trial court noted that the State had exercised two of its three peremptory strikes as to African-Americans and that the trial court did not see a pattern.

However, after the State exercised another peremptory challenge as to Juror Snell, the defense asserted another *Batson* challenge, and the trial court ascertained that, at that point, three of the State's four peremptory challenges had been asserted as to African-American venirepersons. The trial court determined that a prima facie case of discrimination had been established at that point.

The trial court requested that the State give race-neutral reasons for excusing Jurors Payne, Picou, and Snell. However, similarly to the procedure the trial court used in the State's "reverse-*Batson*" challenge, the trial court noted that the State had challenged Jurors Payne and Picou for cause, and found that the State's reasons asserted in the challenges for cause were race-neutral.

With regard to Juror Picou, the State's challenge for cause was as follows:

> I do, Your Honor, Juror #290, Karley Picou. Your Honor, it's the State's position she has been very clear in the fact that she cannot be fair and impartial for a number of reasons should she be chosen as

a juror in this case. She advised she has a fiancée who has been convicted of a crime. She expressed concerns about the criminal justice system overcharging or perhaps not applying the appropriate penalty for certain crimes in her personal opinion. And, she did state that, based on all of those reasons, she could not be fair and impartial should she be selected to serve as a juror in this case.

. . . .

Judge, that is certainly not the State's recall of her statements. The law requires a potential juror to demonstrate an unequivocal -- make an unequivocal assertion of their ability to be fair and impartial, and she never did that.

The only time she stated she could be fair and impartial was in response to questioning about her knowledge of Jasmine Carroll. She said that, should she be chosen as a witness, she wouldn't give her testimony any weight. She's not personal friends. She just knows her from high school. Jasmine Carroll is a potential witness for the State. Other than that she was very, I thought, consistent in her responses about her doubts about the criminal justice system, inability to be unfair because of how it had affected her and her boyfriend personally. And, she did so even in response to Mr. Alexander's questioning of her.

For that reason I believe that, when you consider all of her responses as a whole, her declaration -- she never declared an ability to be fair or to follow the law sufficiently for her to serve on this jury.

With regard to Juror Payne, the State's challenge for cause was as follows:

I submit a challenge for cause for Wilson Payne, Jr. During questioning on yesterday Mr. Payne advised that he could not be fair and impartial multiple times during his questioning. He stated and express[ed] to the Court and to the attorneys a situation in which his brother was, he believed, wrongly arrested, and he was as well, and he was later released. And, I believe he felt they were exonerated later. But, he expressed concerns about arrestive judgment by law enforcement. And, he stated, "I really don't think I could be fair and impartial." He always said he -- he made statements like, "I'm not sure I could be fair and impartial. I would try my best. I think I could." Again, we never got an unequivocal, an affirmative statement he could be fair and impartial other than the comment he made moments ago when the panel was individually questioned. He raised the issue himself saying, "I thought about it last night and I think I could be fair and impartial." Again, he said he could be.

In light of the hours of questioning that went on yesterday when he sat on that panel, Your Honor, I believe that that does not suffice to

override the multiple statements he made on yesterday regarding his inability to be fair.

. . . .

Your Honor, he stated on yesterday he doesn't trust the police. I have law enforcement witnesses who will come forward and present evidence that we believe pertain to the guilt of Mr. Williams. That bias -- that clear bias that he has expressed can't be overridden in my opinion by just an offhand statement about, well, I thought about it last night without any explanation further as to why an event that he said happened 15 years ago, and that still affects him so strongly, why all of the sudden he can put that aside and be trusted to be fair in a case such as this.

We note that where the striking party unsuccessfully sought a challenge for cause and subsequently used a peremptory strike as to that juror, the appellate courts have found that the trial court did not err in considering the reasons for the challenge for cause as proffered race-neutral reasons. *See State v. Seals*, 09-1089 (La.App. 5 Cir. 12/29/11), 83 So.3d 285, *writ denied*, 12-293 (La. 10/26/12), 99 So.3d 53, *cert. denied*, __ U.S. __, 133 S.Ct. 2796 (2013). In this matter, the trial court only required the State to assert additional race-neutral reasons as to Juror Snell. Thereafter, the trial court found that the State's race-neutral reasons for striking Juror Snell were insufficient, granted the defendant's *Batson* challenge, and seated Juror Snell on the jury.[5] Accordingly, we conclude that the trial court permissibly considered the State's reasons in its challenge for cause as proffered race-neutral reasons for peremptory challenges as to Jurors Payne and Picou.

Accordingly, we find no merit as to the defendant's assignment of error in this regard.

---

[5] The record also reflects that, after this third assertion of *Batson* by the defense, the State exercised a peremptory challenge as to Juror Chavis. After considering the State's proffered race-neutral reasons as to Juror Chavis, the trial court granted the defendant's *Batson* motion with regard to Juror Chavis and reseated her on the jury.

*Unconstitutionally Excessive Sentences*

The defendant also asserts that his sentences are unconstitutionally excessive. He specifically contends that when his life sentence for second degree murder is taken into account, the consecutive nature of his sentences for aggravated battery and aggravated criminal damage to property is excessive.

For his second degree murder conviction, the trial court sentenced the defendant to the life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. For the defendant's aggravated battery conviction, the trial court sentenced the defendant to ten years at hard labor to run consecutively to his sentence for second degree murder. For the defendant's aggravated criminal damage to property conviction, the trial court sentenced the defendant to ten years at hard labor to run consecutively to the defendant's second degree murder sentence but concurrently with his aggravated battery sentence.

The mandatory sentencing provision for second degree murder is "life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence." La.R.S. 14:30.1(B). With regard to aggravated battery, the relevant sentencing provisions of La.R.S. 14:34 provide that "[w]hoever commits an aggravated battery shall be fined not more than five thousand dollars, imprisoned with or without hard labor for not more than ten years, or both."[6] With regard to aggravated criminal damage to property, La.R.S. 14:55(B) provides that "[w]hoever commits the crime of aggravated criminal damage to property shall be

---

[6] Louisiana Revised Statutes 14:34 was amended by 2012 La. Acts 40 to change the penalties for certain crimes of battery. Although there is nothing in the record suggesting that the offense in this matter would fall under the new sentencing provision, we use the previous version of the statute as the offense in this matter occurred in 2011.

fined not more than ten thousand dollars, imprisoned with or without hard labor for not less than one nor more than fifteen years, or both."

Accordingly, all of the defendant's sentences are within the statutory range for each conviction. We note that the defendant filed a motion for reconsideration of sentence, which was denied by the trial court.

In *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331, this court addressed excessive sentence claims, stating:

> La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

This court further discussed an appellate court's review of excessive sentence claims in *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.3d 1061, stating:

> In deciding whether a sentence is shocking or makes no meaningful contribution to acceptable penal goals, an appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. *State v. Smith*, 99-0606 (La.7/6/00); 766 So.2d 501. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is

within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, 958.

Our review of the record indicates that the trial court took into consideration the aggravating and mitigating factors contained in La.Code Crim.P. art. 894.1. Of particular note, the trial court indicated that the defendant had two prior felony convictions and was in fact on parole at the time of the offenses. The trial court found no mitigating circumstances. We observe that the testimony and evidence presented at trial indicates that the defendant fired a gun in an apartment complex parking lot where multiple other people were present, causing the death of Mr. Thomas and causing injury to Ms. Perry, who had attempted to remove herself from danger by retreating into her apartment.

The defendant's life sentence without the benefit of parole, probation, or suspension of sentence is mandatory. The defendant received the maximum sentence for aggravated battery, although the trial court declined to impose a fine. We note that the fourth circuit upheld a ten-year sentence for aggravated battery in *State v. Smith*, 94-2588 (La.App. 4 Cir. 3/27/96), 672 So.2d 1034, wherein the defendant fired several bullets into a house, striking one of the occupants in the leg, and then shot and killed another man. Further, the defendant's sentence for aggravated criminal damage to property is within the statutory sentencing range, and we observe that in *State v. Shea*, 436 So.2d 642 (La.App. 3 Cir.), *writ denied*, 440 So.2d 736 (1983), this court upheld a similar sentence where the defendant fired a shotgun into the door of a vehicle, seriously injuring one of its passengers.

With regard to the consecutive nature of the defendant's sentences for aggravated battery and aggravated criminal damage to property, although the trial

32

court imposed these sentences to run consecutively to the defendant's life sentence for second degree murder, he ordered that the defendant's sentence for aggravated criminal damage to property run concurrently with his sentence for aggravated battery. We note that La.Code Crim.P. art. 883 provides that "[i]f the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively." Thus, for crimes committed as part of the same transaction or series, La.Code Crim.P. art. 883 favors concurrent sentences; however, it is within the trial court's discretion to impose consecutive penalties where the defendant's past criminality or other circumstances in his background or in the commission of the crime justify treating him as a grave risk to the community. *State v. Walker*, 00-3200 (La. 10/12/01), 799 So.2d 461.

Our review of the record indicates that the trial court noted that the defendant was on parole at the time of the offenses, as well as the defendant's use of a firearm and "reckless disregard" for others in firing in an apartment complex full of people. We conclude that this reasoning is sufficient such that the trial court had an articulable and particularized basis for concluding that the defendant was a grave risk to the community. *See Walker*, 799 So.2d 461. Further, we observe that, given the defendant's life sentence for second degree murder, the consecutive nature of his sentences for aggravated battery and aggravated criminal damage to property will have no practical effect.

Accordingly, we find no abuse of discretion in the trial court's imposition of sentence and find that the defendant's sentences are not so grossly disproportionate

33

as to the severity of the crime as to shock our sense of justice, and are therefore not constitutionally excessive.

*Unanimous Verdict*

In his brief in proper person, the defendant also asserts that the trial court erred in denying his objection to the jury instruction concerning non-unanimous jury verdicts given in this case. A review of the record indicates the trial court polled the jury, and that the results were 10 to 2 with regard to the second degree murder charge; 12 to 0 with regard to the aggravated criminal damage to property charge; and 11 to 1 with regard to the aggravated battery charge. Our supreme court has repeatedly addressed the constitutionality of La.Code Crim.P. art. 782, which addresses the number of jurors who must concur in order to reach a verdict in a felony case. In *State v. Bertrand*, 08-2215, 08-2311 (La. 3/17/09), 6 So.3d 738, the supreme court reiterated that Article 782 withstands constitutional scrutiny. However, the defendant asserts that, in *Bertrand*, the constitutional challenge was based on the Sixth and Fourteenth Amendments to the United States Constitution, but that his challenge is based upon the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and La.Const. art. 1, §§ 3 and 17(A).

Our review of the record reveals that the defendant failed to preserve this issue for review. An appellate court may not consider a constitutional challenge unless it was properly pleaded and raised in the trial court. *State v. Hatton*, 07-2377 (La. 7/1/08), 985 So.2d 709. The record reveals that the defendant objected to the non-unanimous jury charge and proposed his own jury charge, which was overruled. According to the record, the defendant objected to the non-unanimous jury charge "on grounds of federal Sixth Amendment, Right to Trial by a Jury,

34

which I believe ultimately will be held to require unanimous juries in all cases and in the states through due process clause of the 14th Amendment."

Thus, as the defendant's constitutional objection in the trial court was based on the Sixth Amendment right to a trial by jury, and not the Equal Protection Clause of the Fourteenth Amendment or La.Const. art. 1, §§ 3 and 17(A), we find that consideration of this issue by this court is pretermitted.

## DECREE

For the foregoing reasons, the convictions of the defendant, Ceasar James Williams, a/k/a Ceaser James Williams, for second degree murder, a violation of La.R.S. 14:30.1; aggravated battery, a violation of La.R.S. 14:34; and aggravated criminal damage to property, a violation of La.R.S. 14:55, are affirmed. The defendant's sentences are affirmed. The trial court is instructed to correct the sentencing minutes and commitment order to reflect the sentence actually imposed for aggravated battery. The trial court is further instructed to inform the defendant of the provisions of La.Code Crim.P. art. 930.8 by providing him with written notice within ten days of the date of this opinion and to file written proof in the record that the defendant received the notice.

**CONVICTIONS AND SENTENCES AFFIRMED WITH INSTRUCTIONS.**