NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

24-574

STATE OF LOUISIANA

VERSUS

CHRISTOPHER LEDET, JR.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR 187186
HONORABLE MICHELE S. BILLEAUD, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**GARY J. ORTEGO**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Shannon J. Gremillion, Candyce G. Perret, and Gary J. Ortego, Judges.

**AFFIRMED AND REMANDED**
**WITH INSTRUCTIONS.**

**Edward Kelly Bauman**
**Louisiana Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
  **Christopher Ledet, Jr.**

**Donald Dale Landry**
**District Attorney**
**Fifteenth Judicial District Court**
**P. O. Box 3306**
**Lafayette, LA. 70502**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
  **State of Louisiana**

**Frederick Lewis Welter**
**Welter Law Office**
**712 The Blvd.**
**Rayne, LA 70578**
**(337) 334-8951**
**COUNSEL FOR APPELLEE:**
  **State of Louisiana**

**Christopher Ledet, Jr.**
**Louisiana State Prison**
**Camp C Wolf-2**
**Angola, La 70712**
**IN PROPER PERSON:**
  **Christopher Ledet, Jr**

**ORTEGO, Judge.**

Christopher Ledet, Jr. ("Defendant) appeals his conviction of one count of second degree murder of a 22-month-old child, in violation of La.R.S. 14:30.1. For the reasons that follow, we affirm Defendant's conviction and sentence.

## PROCEDURAL HISTORY

On October 26, 2022, the Defendant was charged by a true bill of indictment with one count of second degree murder, in violation of La.R.S. 14:30.1. On December 13, 2023, Defendant was found guilty by a unanimous jury after an eight-day trial. On March 13, 2024, Defendant was sentenced to life imprisonment without the benefit of parole, probation, or suspension of sentence.

Defendant filed a notice of appeal with the trial court on March 14, 2024. Defendant asserts a single assignment of error: that the evidence presented at trial was insufficient under *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, Ed. 2d 560 (1979) standard to prove beyond a reasonable doubt that he was guilty of second degree murder.

## FACTS

On the morning of July 21, 2022, first responders arrived at the trailer of Quintaya Freeman after receiving a report of an unresponsive infant. The child was later identified as Kaceston Amire Freeman (Kaceston).[1] By the time paramedics arrived on scene, the child had no pulse, was nonverbal, nonresponsive, cold to the touch, and had signs of rigor mortis. Doctors at Lafayette General confirmed his death shortly after his arrival. A follow up

---

[1] Louisiana Revised Statutes 46:1844(W)(1)(a) generally prohibits the public disclosure of the name, address, contact information, or identity of any crime victims who at the time of the commission of the offense are minors under eighteen years of age. However, the public disclosure of the name of a juvenile crime victim by any public official or officer or public agency is not prohibited when the crime resulted in the death of the victim.

autopsy found no external injuries beyond an injured lip but did uncover significant internal injuries in various states of healing. Of particular clinical significance was brain hemorrhaging, which was "days or less old[,]" and a lacerated liver, which was weeks old rather than days old. The coroner determined that the cause of death was blunt force injuries to the head and body due to assault. As stated above, Kaceston was twenty-two months old.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there are no errors patent, but the court minutes of sentencing and the Uniform Commitment Order both require correction.

The sentencing transcript states that the trial court ordered Defendant's life sentence to be served at hard labor. The court minutes, however, do not reflect that the sentence is to be served at hard labor. Additionally, the Uniform Commitment Order does not state the term of Defendant's sentence. "[W]hen the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62, and *State v. Williams*, 15-498 (La.App. 3 Cir. 12/9/15), 181 So.3d 857, *writ denied*, 16-26 (La. 1/13/17), 215 So.3d 242. Accordingly, we order the trial court to correct the sentencing minutes to accurately reflect that Defendant's sentence is to be served at hard labor and we also order the court to correct the Uniform Commitment Order to accurately reflect that the term of Defendant's sentence is life without the benefit of parole, probation, or suspension of sentence.

## ASSIGNMENTS OF ERROR

Defendant asserts one counseled assignment of error and one pro se assignment of error. In his counseled assignment of error, Defendant assert as follows:

1. The evidence presented at trial did not prove beyond a reasonable doubt that Mr. Christopher Ledet, Jr., was guilty of second degree murder.

As to his pro se assignment of error, Defendant contends:

2. At trial[,] the State errored [sic] by referring to Mr. Ledet as someone who's currently running around selling drugs with a kid in the car.

## COUNSELED ASSIGNMENT OF ERROR (SUFFICIENCY)

Regarding his counseled assignment of error, Defendant asserts that the evidence is insufficient to prove beyond a reasonable doubt that Defendant was guilty of second degree murder. Defendant argues that the State failed to prove that he committed acts of gross negligence against Kaceston sufficiently to trigger the felony murder statute. He specifically notes that no one noticed the child's injuries, no doctors observed any signs of abuse during his numerous hospital visits, and that Defendant was not the only one with the opportunity to inflict Kaceston's injuries.

The analysis for sufficiency of the evidence claims is well settled:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess [sic] the credibility determinations of the triers of fact beyond the sufficiency evaluations under the Jackson standard of review. *See State ex rel.*

3

*Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson,* 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

This court has stated the following regarding appellate review in cases relying on circumstantial evidence:

> When the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that the state "must exclude every reasonable hypothesis of innocence" in order to convict. *State v. Camp*, 446 So.2d 1207, 1209 (La.1984). "Circumstantial evidence consists of proof of collateral facts and circumstances from which elemental factors may be inferred according to reason, experience and common sense." *State v. Burns*, 441 So.2d 843, 845 (La.App. 3 Cir. 1983). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded. *State v. Williams*, 13-497 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, *writ denied*, 13-2774 (La. 5/16/14), 139 So.3d 1024.

*State v. Baumberger*, 15-1056, pp. 10–11 (La.App. 3 Cir. 6/1/16), 200 So.3d 817, 826–27, *writ denied*, 16-1251 (La. 5/26/17), 221 So.3d 859, *cert. denied*, 583 U.S. 950, 138 S.Ct. 392 (2017).

Louisiana Revised Statutes 14:30.1(A)(1) defines second degree murder, in relevant part, as the killing of a human being "[w]hen the offender has a specific intent to kill or inflict great bodily harm[.]" Louisiana Revised Statutes 14:30.1(A)(2) defines second degree murder, in relevant part, as the "killing of a human being when the offender is engaged in the perpetration or attempted perpetration of cruelty to juveniles, among other offenses." Under this subsection, intent to kill or to inflict great bodily harm is not required. Louisiana Revised Statutes 14:93(A)(1) defines cruelty to juveniles, in relevant part, as "[t]he intentional or criminally negligent mistreatment or neglect by anyone seventeen

4

years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child." Criminal negligence requires that an offender "have such disregard of the interest of the child that his conduct amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances." *State v. Porter*, 99-1722, p. 15 (La.App. 3 Cir. 5/3/00), 761 So.2d 115, 123.

"A jury is not constitutionally required to agree upon a single theory to convict a defendant so long as the jury is instructed as to alternative theories." *State v. Griffin*, 16-424, p. 42 (La.App. 3 Cir. 4/19/17), 217 So.3d 484, 515, *writ denied*, 17-1027 (La. 3/2/18), 269 So.3d 708 (quoting *State v. Seals*, 09-1089, p. 81 (La.App. 5 Cir. 12/29/11), 83 So.3d 285, 346, *writ denied*, 12-293 (La. 10/26/12), 99 So.3d 53, *cert denied*, 569 U.S. 1031, 133 S.Ct. 2796 (2013)).

### *Evidence Presented at Trial*

Given that Defendant contends the evidence the State presented was insufficient to prove beyond a reasonable doubt that he was guilty of second degree murder, we will examine a summary of the evidence presented at trial.

The first witness to testify at trial was Katelyn Borel, a paramedic with Acadian Ambulance, who testified that she and other first responders arrived after fire fighters had already taken the body of Kaceston into the grass and began performing CPR. She testified that after bringing Kaceston into the ambulance, paramedics determined and noted that he was unresponsive, had a pulse of zero, was nonverbal, had no eye response, was not breathing, was cold to the touch, and had begun to enter rigor mortis. Borel further testified that although the paramedics continued to try to resuscitate him, Kaceston was marked dead on arrival, and she did not note any obvious signs of trauma. During Borel's testimony, the recording of the 911 calls were introduced and played to the jury.

5

Next, Daniel Powers, another paramedic with Acadian Ambulance, testified similarly and confirmed that there were no apparent physical injuries.

Dr. Brooke Schlect, an ER doctor at Lafayette General, testified that there was a lack of external injuries or traumas when she conducted a cursory examination of Kaceston.

Corporal Dylan Smith (Corporal Smith), with the Lafayette Police Department (LPD), testified he was the first officer on scene and arrived shortly after Kaceston had been moved to the ambulance, and he was the first to question Quintaya Freeman (Quintaya), Kaceston's mother, and Defendant, who the officer assumed was Kaceston's stepfather, regarding the incident. Quintaya was hysterical and thus unable to supply much useful information, while Defendant was calmer and gave basic details such as their names, how old Kaceston was, their living arrangements, some information regarding events from the previous night, and Kaceston's medical history. Corporal Smith found nothing out of the ordinary in Kaceton's room, no signs of a struggle, and lots of toys. While Corporal Smith found the circumstances suspicious, he did not suspect that Quintaya or Defendant were lying to him at that time. His body camera footage of his time at the scene, including his discussions with Quintaya and Defendant, was admitted into evidence as Exhibit S-4 and presented to the jury.

Next, Sergeant Robert White, also of the LPD, testified he accompanied Corporal Smith and was present during questioning of Quintaya and Defendant. He testified he did not notice anything suspicious in the environment at the time and called out this observation on the video. He further testified that he did not notice anything out of the ordinary with the behavior of Quintaya, whose reaction was what he said he would expect from somebody who had just lost a child. However, he did note that Defendant seemed more concerned than upset, but he

6

assumed this was because he was not Kaceston's father and had less of a relationship with the child. Sergeant White's body camera footage of his time at the scene was admitted into evidence as Exhibit S-5.

Lafayette Parish Sherriff's Office Metro Crime Scene Unit Detective Chris Evans testified he arrived later in the day to take photographs of the trailer where Kaceston lived. While he was told to look for places where someone may have hit their head, he failed to find any evidence of this, and while some staining was noticed on the bedding and pillowcases in Kaceston's bedroom, he did not notice the smell of alcohol, vomit, or any other unusual smells around the trailer. Detective Evans testified that he did not find any evidence of a cleanup. The State used Detective Evans' testimony to introduce his photographs taken at the scene. The defense also used Detective Evans' testimony to introduce pictures from the same scene. One photo that was specifically highlighted showed a bathroom trash can containing diapers and smoking residue, and pictures showing alcohol were also discussed. The first of these pictures, Exhibit S-15, showed a large Styrofoam cup placed next to a bottle of Taaka pineapple vodka and another glass bottle that was mostly empty save for a sliver of brown liquid. The second of these pictures, Exhibit D-1S, showed a large Styrofoam cup with a plastic straw in the freezer and, in the refrigerator, an opened green can with a percentage label inside a brown paper bag. Defense counsel then cross-examined Detective Evans about these items, as well as his familiarity with drive-thru daiquiris and the Four Loco cans found at the scene.

Next to testify was Doctor Christopher Tape, coroner for St. Tammany Parish and a specialist in forensic pathology. His autopsy report was entered into evidence as Exhibit S-38a. His report indicated that the cause of death was due to blunt force injuries to the head and body due to assault. Dr. Tape testified that his

significant clinical findings included scalp hemorrhages (primarily posterior), subdural hemorrhages at the vertex of the brain, brain edema, optic nerve sheath hemorrhage, retinal hemorrhages, lip contusions,[2] subdural hemorrhages to the spinal cord in the lumbar region, a liver laceration, and right adrenal hemorrhage. There were no acute external injuries or signs of fracture.

Dr. Tape testified the brain injury was determined to be days or less old and not consistent with a fall. The amount of blood surrounding the victim's brain, which was apparent immediately upon opening his skull, was significant enough to prompt Dr. Tape to alert an attending detective that his death was likely a homicide. Dr. Tape specified that the upper range of his time estimate for the infliction of the head injuries would be two to three days and that the lower range would have been mere hours. Accordingly, he stated that it was plausible that the victim's injury occurred the night before. The liver injury, on the other hand, was determined to be healing and therefore days or possibly weeks old. Dr. Tape further noted that the observed abdominal injuries would likely cause symptoms such as nausea, vomiting, and slowed gastrointestinal processes, which he opined were consistent with Kaceston's reported symptoms from when he was seen at Women's and Children's Hospital on July 9, 2022. He opined that these injuries would have required a significant amount of force due to the relevant organs being deep in the body. Dr. Tape concluded that the manner of death was a non-accidental trauma, i.e., homicide, due to the differing ages and locations of the injuries, and pictures of the autopsy were also admitted into evidence with the report.

---

[2]Although the lip contusions are mentioned in the summary of the report, the body of the report says that the lips were normal. Dr. Tape insisted that there were lip injuries and that this was simply an oversight resulting from dictating findings in a preset template.

Next to testify was Latoya Wilson Tinsley (Latoya), Kaceston's grandmother. She was married to Dempsey Tinsley and had four children aged twenty-five (Quintaya), fourteen, ten, and four. She testified that she had a very close relationship with her daughter Quintaya, Kaceston's mother, and was present for many key moments of Kaceston's life, including his birth. Quintaya and Kaceston lived with Latoya until May 2022, but even after moving out of Latoya's home, Quintaya continued to leave Kaceston with her most days. Latoya described Kaceston as a calm, cautious, yet playful child who could not speak and instead would cry to indicate he wanted something. Since Quintaya worked from 4:00 p.m. to 11:00 p.m. most days at a Popeyes located about five minutes from Latoya's house, Latoya watched Kaceston during that timeframe. Quintaya sometimes arrived around midnight, although Latoya denied she would ever show up intoxicated. Kaceston would not go to sleep until Quintaya got home. Latoya's own job involved distributing government lifeline phones in the mornings.

Latoya also described Kaceston's interactions with the other members of her family. Kaceston was close in age to Latoya's youngest child, who was only a year older. The younger children played with Kaceston, and while there were claims that the kids threw rocks around (including, at one point, breaking her husband's windshield), she denied that they played rough. Latoya specifically denied, with one exception, that Kaceston would return to Quintaya with scratches or bruises. The exception involved an incident with a small table fan. Latoya claimed that the fan grazed him but did not fall on him and that there was only a superficial cut without bleeding. Latoya testified that if neither she nor Quintaya were present, responsibilities for watching Kaceston fell to either her husband or her then-thirteen-year-old daughter, Leary, the latter of whom reported the incident with the table fan. Latoya claimed that Leary did not watch Kaceston very often

9

and, when she did, usually only for short intervals. She denied that Leary in particular would have been alone with Kaceston on July 4, July 6, or July 19, 2022.

Regarding the last months of his life, Latoya testified that Kaceston had gone to the doctor in June due to fussy eating. A dietary issue with rice was suspected, which was similarly cited as a complaint during a doctor's visit the previous February. Kaceston was back to normal in terms of his eating and drinking by July 4, 2022, when he was present for a large family gathering, and he was also acting normal the following day. Latoya was not aware Defendant was dating Quintaya until the July 4, 2022 family gathering.

Latoya then testified that there was a change in Kaceston's routine on July 6, 2022, after Defendant watched him. She testified that on July 7, 2022, Kaceston did not behave normally. Specifically, he was fussy, clingy, sluggish, and had a knot on his forehead. Latoya called Quintaya to alert her about this change and told her to take him to the hospital, which she did in the early morning hours of July 8, 2022. According to Latoya, Quintaya claimed the knot came from a fall, and she was aware that Quintaya took Kaceston to the hospital again on July 9, 2022, where he was diagnosed with constipation.

Latoya then testified that Kaceston slowly got better over the next few days and was approximately ninety percent normal by July 19, 2022, the last day that Latoya babysat him. Although Latoya was supposed to watch Kaceston on July 20, 2022, Quintaya told her that Defendant would watch him along with his other kids. Latoya texted Quintaya at 12:30 a.m. the following morning to confirm that she had arrived home. Latoya testified that Defendant called Latoya the following day to notify her that Kaceston was not breathing, and although she raced to the hospital, she did not arrive before Kaceston was pronounced dead.

During cross-examination, Latoya testified that she noticed that Kaceston's behavior towards Quintaya changed near the end of his life. For example, he would cry when she came to pick him up. Although she denied that he was really crying not to leave, she nonetheless had concerns regarding this behavior, and that she may have informed detectives of these concerns on July 25, 2022, particularly regarding Quintaya and Defendant's behavior the night before Kaceston's death.

On redirect, Latoya testified that she had a particular history of trauma that led to her bringing the kids to the doctor for "everything[,]" which was a habit Latoya stated that Quintaya continued with Kaceston. She also emphatically denied that Kaceston ever had any significant falls, been hit by a car, had a broken bone, or even gotten stitches while in her care.

The next five witnesses were medical professionals who had come into contact with Kaceston prior to the July events leading to Kaceston's death. Dr. Karunasri Janga, a pediatrician with the Pediatric Group of Acadiana, was Kaceston's primary pediatrician. Dr. Janga testified the last time she saw Kaceston was on June 29, 2022, for a Head Start physical and also for the purposes of following up after Kaceston's trip to the ER earlier in the month. She stated that she observed no lingering symptoms at that time. She also testified that she saw him in early February 2022 for stomach issues, which she suspected were dietary in nature, and that he showed no such symptoms in a follow-up visit. She noted that all of Kaceston's other visits, every few months, were either simple wellness checkups or for treatment of minor ailments. According to Dr. Janga, Kaceston was an overall healthy child who was progressing normally, and she never flagged any signs of abuse. She noted that one such sign of abuse is if a child was frequently sick but never brought in for medical attention.

11

Lacie Stafford Moore, a physician assistant at Women's and Children's Hospital, testified regarding Kaceston's visit to the ER on June 18, 2022. The primary complaint was that he was fussy and had hard bowel movements, which the mother worried was due to feeding him rice the previous night. Kaceston was tested for diabetes, for which he was negative, at Quintaya's request. An x-ray and physical exam were also carried out, neither of which indicated anything unusual aside from a distended abdomen, and no neurological symptoms or signs of child abuse were observed as part of these exams.

The next three medical professionals, Dr. Keith Elliot Strain (a pediatrician specialist formerly working in the ER at Women and Children's Hospital), Brittany Lanclos (a nurse practitioner in the ER at Women and Children's Hospital), and Dr. Eric Guilbeau (physician in the ER at Women and Children's Hospital) all testified similarly regarding Kaceston's prior visits to the hospital for minor ailments in 2021 and their lack of any serious concerns.

Next, two medical professionals testified concerning Kaceston's visits to the hospital in July of 2022. Dr. Thomas Golan, a physician in the ER at Women's and Children's Hospital, testified he saw Kaceston in the early morning hours of July 8, 2022. Kaceston's primary complaint was vomiting that had started that night, and the physical exam did not uncover anything significant. Therefore, Kaceston was prescribed an anti-vomiting medication and sent home. Dr. Golan further testified that he discovered no signs of abuse or neglect, such as unexplained bruises, and he also did not think Kaceston was malnourished or dehydrated. However, Dr. Golan did observe that Kaceston was a bit underweight. Dr. Juan Fukuda, another physician in the ER at Women's and Children's Hospital, testified he saw Kaceston the following day, and noted that Kaceston was still vomiting and now had a decreased appetite. Dr. Fukuda testified a flat abdominal

12

x-ray was carried out to check for any obstructions, and the only such obstruction observed was an excess amount of stool in the bowel. Dr. Fukuda's notes from that day did not indicate the presence of any bumps on Kaceston's head, and Kaceston was ultimately diagnosed with constipation and given some laxatives.

The next witness to testify was Quintaya, and she started by recounting their lives before Kaceston's final month. She described their routine as getting up after 11:00 a.m., her going to work around 4:00 p.m., her getting back after 11:00 p.m., and then both of them going to sleep shortly after. Quintaya testified that she left Kaceston with Latoya when she worked, which was most days. She described Kaceston as a happy, cautious, laid-back child, and that he did not speak and would, instead, indicate whether he wanted something by either pointing at it or by crying. Quintaya testified that she brought Kaceston to the doctor any time he was sick, regardless of how minor a particular ailment seemed to be. She denied that Kaceston ever hid from her or cried when she went to pick him up in June of 2022.

Quintaya testified that she began dating Defendant sometime after March 2022 and moved out of Latoya's house after May 2022. Quintaya gradually introduced Kaceston to Defendant and by June 2022, Defendant was a frequent visitor to their house. Additionally, Defendant paid Quintaya's bills and bought lots of things for Kaceston.

On July 6, 2022, she testified that because Defendant was not working, he offered to take Kaceston, along with his own children, to Jungle Gardens that day. She testified that they met Defendant at Walmart in Broussard, and although Kaceston was in normal health the previous day, he did not eat much that morning. According to Quintaya, Kaceston was quiet and even less willing to eat when he got back that day and had a noticeable bump on his head, a picture of which was admitted into evidence as Exhibit S-74. She testified that she texted the Defendant

for answers regarding the bump and the sudden shift in Kaceston's condition. A picture of the bump was admitted as Exhibit S-88. Defendant claimed in these texts that while he noticed the bump later, he failed to notice at the time, which lead Defendant to assume that Kaceston had fallen sometime at Jungle Gardens without crying, and Defendant speculated that any constipation may have been caused by him supplying Kaceston with too much junk food. Quintaya took Kaceston to the hospital after he started vomiting.

The texts messages between the two took a turn after Quintaya relayed Latoya's suspicions that Defendant may have hurt Kaceston. Defendant responded poorly to this accusation, and she and Defendant temporarily broke up as a result. Despite Latoya's suspicions, Quintaya testified that she trusted Defendant, stating that Kaceston slowly got better after this incident. After further text discussions, there was an apparent reconciliation between Quintaya and Defendant, with Defendant offering to take Kaceston again on July 20, 2022.

Quintaya met Defendant at a Walmart in Broussard to exchange Kaceston. Defendant sent some Snapchats of Kaceston from his own mother's house and later, around 7:30 p.m., he FaceTimed Quintaya while they were leaving Sonic. In the photo, Kaceston was visible with tatter tots and a drink. Quintaya testified that Defendant FaceTimed her again later that evening showing Kaceston playing with toys in a bathtub, and that there was a lack of obvious hazards, such as sharp objects or high water. Defendant hung up briefly to go smoke, then called back, this time showing Kaceston in the tub with poop in the tub with him. Kaceston was not crying and was still playing with his toys, and Defendant did not seem angry. She testified that there was a longer break while Defendant claimed to clean up Kaceston and the tub. When Defendant FaceTimed Quintaya again about thirty minutes later, he was rocking Kaceston, whose eyes were fluttering open and

14

shut. Quintaya claimed it was highly unusual for him to fall asleep before she got home, although later she noted that Kaceston fell asleep quickly when he was rocked.

Quintaya further testified that she arrived home around 11:30 p.m. that evening, at which point Kaceston had already been put to sleep in his crib. Kaceston's room had been rearranged while she was away, with his crib having been moved into the corner by Defendant where it was harder to see without walking into his room. Furthermore, Kaceston had a blanket over his face, but this was apparently normal. When asked, Defendant claimed that he had rearranged the room to give Kaceston more space to play.

Quintaya testified that she then began drinking with Defendant. While she claimed it was uncommon for her to drink after getting home from work, she testified that Defendant suggested they do so and poured the drinks. She thought they were drinking E&J brandy. She got drunk shortly thereafter, although it felt unusual and happened shortly after taking a few sips from a recently refilled cup. Defendant helped her back into the house from the outside steps while videoing her, and a Snapchat video, with a 12:52 a.m. timestamp, was admitted as Exhibit S-89 and played for the jury. The video showed Quintaya with a towel over her head in what appeared to be the bathroom. She did not remember when she fell asleep, but she may have been awake and vomiting around 1:00 a.m. Although she initially testified that she woke up around 3:00 a.m. to check on Kaceston, she recanted that testimony. She testified that when she woke up the next morning between 6:00 and 7:00 a.m., she was still feeling sick and vomiting in the toilet. Defendant was awake and sitting in bed, and he offered to get Kaceston dressed and ready for a haircut later in the morning. Quintaya testified that shortly thereafter, Defendant alerted Quintaya that Kaceston "must be really tired[.]"

15

When Quintaya checked on him, Kaceston's head was "flapping all over the place" and his body was already cold.

After Quintaya's initial testimony, two videos of her statements to the police from July 21 and July 28, 2022, were played to the jury. During her first interview shortly after Kaceston's death, she noted how Kaceston had not been eating much prior to his death, although he had stopped vomiting a few days after his last visit to the doctor. She cited both the meager amounts he had eaten during the morning of July 20, 2022, as well as the limited number of tater tots that he had appeared to have eaten when Quintaya saw him on FaceTime. She described how she saw Kaceston on FaceTime periodically throughout July 20, 2022, starting at around 5:00 p.m. and ending when Defendant rocked him to sleep around 10:30 p.m. She claimed to have woken up initially around 3:00 or 4:00 a.m. to briefly use the restroom but otherwise arose between 6:00 to 7:00 a.m., along with Defendant. After a brief chat with him, she went to the bathroom while he went to put on Kaceston's clothes, make breakfast, and/or prepare him for a haircut later that morning.

She was unable to recall Kaceston ever having any significant falls or injuries. Although she admitted that he would sometimes have scraped knees after coming back from Latoya's house, she denied that Kaceston would roughhouse with the other kids or that these injuries were on the head. When asked about his trip to Jungle Gardens earlier in the month, she mentioned that he had mosquito bites that went away the next day but did not mention any head injuries.

During the second interview, Quintaya reiterated that Kaceston was not acting normally the week of his death. Although she was pretty sure he was not vomiting that night, she noted that his appetite was decreased, and he was only

16

willing to eat food in limited quantities. Quintaya disagreed with Latoya's claims that his appetite was significantly improved.

Prompted to give a full timeline of his final day, Quintaya noted how she handed Kaceston off to Defendant at the Walmart in Broussard at around the usual time, 4:00 p.m., at which point Defendant took him to Defendant's mother's house. The next time she saw Kaceston was when Defendant FaceTimed her after getting food from Sonic, during which time Kaceston appeared to be fine. The next time she saw Kaceston was when Defendant FaceTimed from the bathtub. After a brief interruption due to battery issues, Defendant called back and showed Kaceston playing in the tub. Kaceston was apparently happily playing with his toys in the tub and did not want to get out, so Defendant let him play with a small bit of water. He appeared happy and content. She claimed Defendant laughed when he saw the poop and was not angry, but he did get off the phone shortly after, as she consistently testified that she saw poop in the tub with Kaceston at this time.

When asked again about the Jungle Gardens visit, Quintaya claimed that she was unaware of anything that happened to Kaceston except possibly binging on too many snacks. When asked about her alcohol consumption, she claimed that neither she nor Defendant were big drinkers, but she did state that he smoked weed, and that the large amount of liquor was left over from a party.

Quintaya testified that the next time she saw Kaceston was when Defendant FaceTimed her while rocking Kaceston to sleep. The gap between these two calls may have been about thirty minutes. She noted that he was sleeping sideways but otherwise breathing when she got home. She also testified that she may or may not have checked on him later that night, and one of these checkups was around 1:00 a.m. and may have been nothing more than flashing a light in the room while

17

walking by. Her details regarding waking up around 6:00 to 7:00 a.m. were unchanged.

During cross-examination, Quintaya was questioned specifically regarding Kaceston's interactions with other members of her family. It was pointed out that Leary, who sometimes watched Kaceston, was in an alternative school for bad behavior, usually had her door closed, and had to be told when Latoya was stepping out of the house. On the other hand, Quintaya testified that Leary's room was directly adjacent to the living room, so she would have no trouble hearing Kaceston if he were in distress, and she reported any incidents that happened while alone with Kaceston (such as the fan incident). Accordingly, Quintaya felt that Leary was generally responsible enough. Quintaya was also asked whether Kaceston would play rough with other children, and she agreed that an eight-year-old who spent time with Kaceston played rough and that sometimes he was blamed when Kaceston had scratches. She also noted that the kids at Latoya's house may have occasionally jumped off sofas, played around near concrete steps outside the house, and had even thrown rocks on occasion; however, she insisted that the eight-year-old was not actually rough housing with Kaceston specifically and that she did not think that Kaceston had ever had a significant fall. Quintaya testified that she was unaware of any animus or reason her mother or younger sister Leary had to hurt Kaceston.

Quintaya was also asked about alcohol usage. She reiterated that she was an infrequent drinker, but when she did, she preferred drinks with flavors like daiquiris, which she picked up from a drive-thru. She claimed she did not drink or even know what Four Locos was but was not surprised that a can of it was found in her refrigerator, as she claimed it was something that Defendant drank. She conceded that her earlier testimony was the first time she had ever told anyone

18

about Defendant serving her drinks on the night of July 20, 2022, or that she was intoxicated.

Questions were also raised concerning the exact nature of the bump on Kaceston's head after Defendant watched him on July 6, 2022. Quintaya conceded that she did not initially notice the bump on Kaceston's head when she picked him up from Defendant that night, although she noted that it was already dark outside when they met. She also conceded that Kaceston had many mosquito bites on him, including on his head, and that the mosquito bites had gone down, along with the bump, by the time she took Kaceston to the doctor, and she did not mention this bump to the doctor at this time.

Sergeant Bobby Goodrich, a member of the sheriff's Real Time Crime Center, testified for the purposes of introducing the results of license reader searches. Sergeant Goodrich testified that he was specifically requested to run a search for a license plate belonging to Defendant's vehicle[3] for dates including July 6 and July 20, 2022, and to map out his movements using traffic cameras. He testified that the results of these searches, which were discussed later during Detective Duhon's testimony, indicated that Defendant's vehicle had not actually driven in the direction of Jungle Gardens on July 6, 2022, the day he claimed to take Kaceston there, until after closing time. Sergeant Goodrich did note, however, that there were other routes to get to Jungle Gardens, such as backroads, that would not have been picked up by traffic cameras.

Next to testify was Senior Technical Support Officer Frank Garcia with the Louisiana State Police, whose specialty is phone forensics. His report detailing the

---

[3]Quintaya had earlier testified and confirmed that Defendant was driving that relevant car on July 6, 2022.

19

data he was able to pull from Quintaya's phone, including account information and text messages, was entered into evidence as Exhibit S-85. His report was not examined during his own testimony and was instead admitted by the State for later reference.

Detective Julia Poirier with the LPD's Metro Crime Scene Unit testified and her report detailing the data she was able to pull from Defendant's phone was entered into evidence as Exhibits S-86 and S-87, with the former containing the call log and the latter containing the web searches. For July 20, 2022, the call log indicated that Quintaya and Defendant video called each other for eight minutes at 9:03 p.m., called each other for eight minutes at 8:30 p.m., video called for six minutes at 9:33 p.m., video called for four minutes at 9:41 p.m., FaceTimed for fourteen minutes at 10:38 p.m., and video called for two minutes at 11:28 p.m.

Detective Poirier further testified that Defendant's web searches on the night of July 20, 2022, and the early morning of July 21, 2022, included "What helps a swollen lip go down fast[,]" "How fast should a child's heart best n[sic] a min [sic][,]" and "When you dont  [sic] have no [sic] control of your body, but you [sic] breathing," with the first two of these searches being made at 10:04 p.m., well before Quintaya would have returned home. Detective Poirier testified that Defendant's later searches included "How long can you bleed on the brain before dying" on July 22, 2022; "Head trauma" and "Acute head trauma" on July 27, 2022; and "Blunt force trauma to TG," "Blunt force trauma to the head," "How long can you be detained without evidence," "police investigation procedures manual," "police investigation steps," and "how long can you be detained without evidence" on July 28, 2022. Detective Poirier further testified that Quintaya's phone searches before Kaceston's death include things for a birthday party and her searches after his death included "paw patrol caskets" and signs from heaven.

20

Detective Poirier noted that not all searches and texts would necessarily have been included in the report.

Detective Brooke Duhon, a juvenile detective with the LPD and lead detective in this case, testified she became involved with the case before Kaceston was declared dead at the hospital. She testified that her first steps were to inspect the Freeman residence and attend Kaceston's autopsy. Detective Duhon testified that she did not find anything notable at the residence, and that she was present when Dr. Tape started looking at Kaceston's brain and discovered the blood. At this time, she was informed that she was "working a homicide." Although she remained open to the possibility this was an accident, she considered this unlikely after the medical examiner insisted that Kaceston would have had to fall off a roof or receive other equivalent trauma for that to be the case. Detective Duhon testified that the medical examiner also recommended that she focus her search on events in the beginning of July of 2022, as well as close in time to Kaceston's death.

Detective Duhon further testified that she interviewed Quintaya and Defendant on July 21, 2022, and July 28, 2022. Videos from her interviews with Defendant were admitted as Exhibits S-79 and S-81 and were played during her testimony. During his first interview on July 21, 2022, Defendant described Kaceston in general as a clumsy kid who was clingy, fell frequently, and would cry for things when he wanted them. He described his recent health issues, including weight loss after being diagnosed with constipation, and that he generally had not been eating for the past few months. He was under the impression that Kaceston would engage in rough play, including fighting with toys with Quintaya's younger brothers when at Latoya's house, as he would sometimes come back with scratches. He did acknowledge, however, that he had no direct knowledge of what

21

Kaceston did at Latoya's house since he did not go or visit her house. He strongly denied suggestions that Leary may have played rough with Kaceston and insisted that she was very fond of him.

According to Defendant, Kaceston only had a few bites to eat the morning of July 20, 2022, which he claimed was Kaceston's normal behavior for as long as Defendant had known him. He stated that he picked up Kaceston around 4:30 p.m. on July 20, 2022, and was at his mother's house for the majority of that time. He took Kaceston to Sonic later on and bought him some tatter tots, but Kaceston did not consume very many of them.

During Defendant's first interview, he gave two different versions of what happened in the tub during this interview. Initially, he claimed that Kaceston fell while trying to run out of the tub, but when specifically asked where the fall occurred, he clarified that he fell after running out of the bathtub and running into something in the hallway. Defendant claimed that Kaceston cried for a short while but quickly got over it. He also claimed that Kaceston said to Quintaya that he loved her over the phone after getting out of the tub. Afterwards, he stated that he placed ice and a towel on Kaceston and rocked him to sleep while sitting in front of an air conditioner.

Defendant stated that Quintaya arrived around 11:30 p.m. and that they stayed awake until 1:00 or 2:00 a.m. He claimed that he would check on Kaceston periodically while he was still awake and that as far as he was aware Kaceston was still snoring at this point. He claimed that he and Quintaya woke up around 6:00 or 7:00 a.m., and that he went to get Kaceston while Quintaya went to the bathroom.

In Defendant's first interview, he also discussed the trip to Jungle Gardens, which he described as a dad's picnic. He described Kaceston as being rather active while at Jungle Gardens but completely lethargic after getting home. Defendant

22

claimed Kaceston's stomach issues, including vomiting, started at Jungle Gardens and he theorized this was the result of too much junk food. Defendant did not know if Kaceston fell since he did not hear any crying, but he acknowledged that he may have fallen while playing. We note that while Defendant was not being actively questioned, the camera showed him saying to himself, "My baby man, my fucking baby," as well as a few other similar utterances.

During Defendant's second interview, he repeated similar details of how he picked up Kaceston around 4:00 or 5:00 p.m., took him to his mother's house, went to Sonic, and picked up some tater tots for Kaceston. Defendant then began discussing the events in the bathtub, changing certain details between retellings. Initially, he claimed that he left Kaceston in the tub (since he did not want to get out of the tub) to go rearrange the furniture in Kaceston's room. He claimed that Kaceston eventually came running out of the tub, at which point Defendant returned to the bathroom, wiped Kaceston off, and began rocking him to sleep. He did not mention smoking. He claimed that he was on FaceTime with Quintaya while Kaceston was in the tub and may have remained on the phone while rearranging the toys, although he quickly admitted that he may not have. He initially denied that he also went out to smoke at this time but quickly added his trip outside to smoke to his subsequent retellings. He claimed that he cleaned out the poop from the bathtub while wiping Kaceston off and before bringing him to the air-conditioning to rock him to sleep. He also said that Kaceston's injury occurred while he was running out of the bathroom shortly after Defendant stepped outside to smoke. Defendant was unsure precisely how this injury occurred, since he only heard the crying, but he figured Kaceston fell forward due to the bleeding lip.

23

Defendant then claimed, in the same breath, that Kaceston pooped in the tub before he got out of the tub, that he was in the tub when Defendant got back inside, but that Kaceston never got back into the tub. When Detective Duhon pointed out that these were mutually exclusive contentions, Defendant then stated that the poop was not in the tub when Kaceston was in the tub, that Kaceston was not in the tub when Defendant came back inside, and that Defendant did not put Kaceston back in the tub, opting to wipe him off with soap and a towel.

When Detective Duhon pressed Defendant to try telling the story again, he again insisted that he left Kaceston in the tub because he wanted to keep playing and that Defendant used the opportunity to rearrange Kaceston's room. This time, Defendant insisted that he was on FaceTime with Quintaya while rearranging the room. After a short while, he checked back on Kaceston and then went outside to smoke. Kaceston ran out of the bathroom and started crying shortly thereafter, prompting him to pick Kaceston up and take him to the bathroom, at which point he noticed and started to clean the poop. Defendant insisted he pointed out the poop to Quintaya over FaceTime.

During Defendant's second interview, Detective Duhon related Quintaya's version of events and asked Defendant about the poop again. Defendant initially claimed that he took Kaceston out of the tub when he pooped. Then when Detective Duhon pointed out this was inconsistent with his previous interview, Defendant then claimed that the poop was not in the tub when Defendant left the room. Defendant insisted emphatically that Kaceston was not sitting with the poop in the tub at any point and he was definitely not in the tub or playing with his toys when Defendant was showing Quintaya the poop over FaceTime. As to rearranging Kaceston's bedroom, Defendant then changed his prior statement that he was Face Timing with Quintaya while rearranging Kaceston's room, now

24

stating instead that he was doing this over a normal voice call. Defendant again mentioned that other kids at Latoya's house may have played rough with Kaceston.

Detective Duhon further testified that her concern and the most significant divergence between Quintaya and Defendant's statements/stories regarding the events of July 20, 2022, was concerning the poop in the tub and the order in which things occurred in between the later FaceTime calls. Detective Duhon felt Defendant's story was the more suspicious, particularly since it lacked internal consistency, and her suspicions were heightened by the results of the various phone searches she had ordered. Detective Duhon also noted a text Defendant sent on July 21, 2022, shortly after the first interview, stating that he was being questioned "about murder" despite that not having actually come up during said interview, and that the timing of Defendant's internet searches, starting at 10:04 p.m., all fell between FaceTime calls at 9:45 and 10:38 p.m. She testified that the gap between these calls roughly matched the length of time that Quintaya stated had passed between the last time she saw Kaceston in the bathtub and when she saw Defendant later rocking him to sleep. Detective Duhon further testified the specific wording of one of Defendant's searches, "when you don't have no [sic] control of your body, but you [sic] breathing[,]" also caught her attention because of the similarity in wording he used during the 911 call. During that call, Defendant said that Kaceston "did not have no [sic] control of his legs." Detective Duhon testified that the results of the search of Quintaya's phone did not raise Detective Duhon's suspicions as to Quintaya.

Detective Duhon testified that after interviewing Defendant the first time, she called Jungle Gardens to check whether they had video camera footage relevant to the visit on July 6, 2022. Jungle Gardens did not possess such footage, but while calling she discovered that their hours of operation were from 9:00 a.m.

25

to 5:00 p.m. This caught her attention, as Defendant would have picked Kaceston up around 4:00 p.m. and thus it would have taken an hour to get to Jungle Gardens.

Detective Duhon testified that the results of Sergeant Goodrich's license plate searches showed that Defendant's vehicle began heading in the direction of Jungle Gardens after it had already closed for the day, and although Detective Duhon stated that he was aware of there being alternative routes that would have avoided the traffic cameras, those routes would have taken even longer and precluded any possibility of him arriving at Jungle Gardens before it closed on that date. Accordingly, she testified that she was confident that Defendant was lying about taking Kaceston to Jungle Gardens that day. Defense counsel later asked Detective Duhon if she was aware that patrons could stay on the nature trail past 5:00 p.m. She stated that she was aware of this fact, but it did not change her conclusion.

During cross-examination, Detective Duhon was asked questions regarding Latoya. During Detective Duhon's interview of Latoya on July 21, 2022, which was not entered into evidence, Latoya apparently claimed that Kaceston was more or less fine and eating normally the day before he died, which was consistent with her testimony at trial but inconsistent with Quintaya and Defendant's descriptions. Latoya had also apparently called police several days after Kaceston's death to inform them of her suspicions regarding both Quintaya and Defendant. Defense counsel also asked Detective Duhon whether she was aware that Latoya's husband, Dempsey Tinsley, Jr., had a criminal background. When Detective Duhon said she was not, the defense counsel introduced Exhibit D-2, minutes from the 16th Judicial District Court, Parish of St. Mary, from 2010. The minutes indicated that he was charged with distribution of marijuana while having previous convictions for simple burglary and simple robbery.

26

Dr. Paige Culotta, a child abuse pediatrician at the Children's Hospital of New Orleans, then testified she did not treat Kaceston but did receive his medical records from Dr. Janga. Dr. Culotta testified and explained that the liver and adrenal injuries in Kaceston would cause symptoms such as vomiting, upset stomach, lethargy, and fussy eating. These symptoms would not necessarily manifest immediately. According to her, a child with abdominal trauma would often present no external signs, and detecting the injury would generally require a CT scan. She opined that the lack of external signs and the non-specific nature of the symptoms made it unlikely to be diagnosed during an examination. She agreed with Dr. Tape's assessment that the amount of force required to produce this injury would have to be very significant due to the liver being deep in the body. She was highly skeptical that these could be accidental injuries, absent something obvious like a car crash, because the level of force required was simply not something that would occur from running or falling in the course of typical play. Such injuries were uncommon and, in her experience, were more commonly found in children who were abused. She was not as concerned by the lip injury, since a child's normal activities would create many vectors by which such an injury could accidentally occur.

Dr. Culotta's assessment regarding the head trauma was that a head trauma significant enough to lead to death would cause symptoms such as sleepiness, seizures, unconsciousness, vomiting, and an inability to tolerate a bottle. In contrast with the liver injury, she would expect these symptoms to manifest immediately, and they would be so noticeable that even an inattentive caregiver should be able to quickly notice them. She hypothesized that the head injury could have occurred via a rapid acceleration/deceleration whiplash type of event, with the force of the head moving back and forth causing veins to break.

Dr. Culotta was skeptical that either of those injuries could have been inflicted by another child during the course of regular play, since children typically do not inflict such significant injuries on each other unless the other child has notably violent, problematic behaviors. She would be concerned about a felon being a potential caregiver but was less concerned that a thirteen-year-old caregiver could create a risk of these injuries for the above reasons. Dr. Culotta further testified that a caregiver who was used to caring for other children, such as Defendant, would also generally not be a concern to her.

*Law and Discussion*

a. Defendant's position

Defendant primarily argues that the State failed to prove that the source of Kaceston's fatal injuries was Defendant, who had very limited contact with Kaceston. Defendant further contends that his admission that Kaceston suffered "minor" injuries while in his care incorrectly resulted in him becoming the authorities' primary suspect. He avers that other individuals had more contact with Kaceston, some of whom were not even interviewed by authorities.

Defendant also argues that no one in the home noticed Kaceston's injuries prior to his death. Furthermore, despite Kaceston's numerous hospital visits prior to his death, health care workers observed no signs of abuse that would have triggered their duty to alert authorities. Defendant contends that Detective Duhon testified that the injuries Kaceston sustained could have occurred from two to four days prior to his death. Two to four days before his death, Kaceston was in Latoya's home (in which, Defendant notes, Latoya's three-time convicted felon husband also resides), though it was unclear who was watching Kaceston at that time. At most, Defendant concedes he may be guilty of negligent homicide, "[t]he killing of a human being by criminal negligence." La.R.S. 14:32.

28

b. <u>State's position</u>

The State contends that the evidence was more than sufficient to uphold Defendant's conviction. The State argues that Defendant's involvement in Kaceston's life coincided with Kaceston's downturn health-wise, as well as Defendant's own admissions that the child was injured while in his care. Furthermore, the State underscores that Defendant's internet searches on his phone related directly to injuries and symptoms of distress, while babysitting Kaceston, which indicates that Defendant was aware of the injuries and suffering of Kaceston, and thus the inference drawn by the jury that Defendant caused the injuries was warranted.

c. <u>Analysis</u>

As previously noted, second degree murder is defined, relevantly, as either the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm, or the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of cruelty to juveniles, which is defined as the intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child. Although the State argued both theories at trial, the State did not need to prove that Defendant sought to kill or seriously harm Kaceston to convict Defendant. Thus, the State only needed to prove that he intentionally or negligently mistreated Kaceston to a criminal degree and that this mistreatment led to Kaceston's death. Additionally, the jury is not required to agree on a single theory so long as it is instructed as to the alternative theories, which the jury was in this case.

Although the record in this case is voluminous, the State's case is straight forward. Kaceston was an otherwise healthy child until July 2022. Defendant had

sole custody of Kaceston on two occasions, July 6, 2022 and July 20, 2022. Kaceston became sick shortly after this first occasion and died the morning after the second one. The evidence shows that severe internal injuries were discovered during Kaceston's autopsy. Although witness testimony in this case could only speculate as to how precisely the injuries were inflicted, they did establish that these injuries were not accidental when considering the amount of force required to inflict them and the various states of healing of these injuries.

*Abdominal injuries:*

First and foremost, Kaceston's injuries coincide with those occasions when Defendant was in sole custody of the child. Specifically, and as to Kaceston's abdominal injuries, the evidence shows Kaceston began showing signs consistent with a serious liver injury on July 8, 2022, and presented with the symptoms of such an injury when he visited the ER in the early morning hours of July 8, 2022, which was immediately after one of the occasions that Kaceston was in the sole care of Defendant on July 6, 2022. The evidence presented to the jury shows that it would take two and three days for the symptoms of such an injury to manifest, which matches the timeline wherein Kaceston would have been injured and when the injury would have become systematic. While Kaceston also presented these symptoms in a hospital visit on June 18, 2022, those symptoms had been resolved before July of 2022. Thus, presenting the jury with a strong plausible inference that the abdominal injuries occurred shortly before the July 8, 2022 ER visit, i.e., on either July 6 or July 7, 2022, which coincide with the time when Defendant had sole custody of Kaceston.

Furthermore, the license plate reading evidence presented to the jury demonstrated a strong likelihood that Defendant lied to police about where he took Kaceston on the date the medical evidence established the injury occurred. Thus,

we find the State provided sufficient evidence for the jury to infer that these injuries were inflicted around July 6, 2022, or July 7, 2022, which overlaps with the first time Defendant had sole custody of Kaceston. Therefore, we find that the State provided sufficient evidence that Kaceston's fatal injuries were the result of child abuse inflicted when Defendant had sole custody of Kaceston.

*Head injury:*

As to Kaceton's head injury, the coroner testified that Kaceston's head injury could have occurred a maximum of two to three days prior to Kaceston's death. The medical testimony at trial, and in particular Dr. Culotta's testimony regarding how the symptoms of such an injury are extremely noticeable and should present almost immediately. We find this evidence indicated that it is far more probable that the head injury occurred shortly before Kaceston's death either late on July 20, 2022, or in the early hours of July 21, 2022, when such symptoms became apparent. The evidence further shows that Defendant had sole custody of Kaceston on July 20, 2022, and on the morning when he died.

The State's other critical and pervasive evidence took the form of the Defendant's internet searches found on his phone. Defendant's research, on the night of July 20, 2022, infers that he knew Kaceston was grievously injured, which suggests that he inflicted the injury to Kaceston, or at the very least, did not attempt to seek necessary medical attention for the child. Specifically, Defendant's research for "what helps a swollen lip go down fast[,]" "how fast should a child heart best n [sic] a min," and "when you dont [sic] have no control of your body but you [sic] breathing," provides an adequate basis for the jury to find that Kaceston's head injury, which would have caused symptoms immediately, was inflicted around the same time he was in Defendant's sole care. Further, even if Defendant was not the only adult around, the fact that Defendant noticed Kaceston

31

was in extreme medical distress and he did not attempt to seek medical care for Kaceston or alert anyone else, in and of itself shows a conscious, callous disregard for the injuries and suffering of Kaceston.

Additionally, and not only that the Defendant did nothing to assist Kaceston's injury and suffering, but the evidence further shows Defendant took steps to cover up the medial distress he knew Kaceston was suffering. Specifically, the evidence of Defendant's rearranging of Kaceston's bedroom to move his crib out of immediate sight, along with the evidence of his plying the child's mother, Quintaya, with alcohol, were all steps to make it more difficult for Quintaya to check on the Kaceston on the evening he died. Thus, Defendant's behavior is suggestive of an intentional cover-up by Defendant, providing a strong inference he committed the crime, and provided the jury with sufficient evidence to infer that Kaceston's head injury was inflicted by Defendant, and that this was not merely an unfortunate coincidence or accident.

In summary, we find the State's evidence sufficient to show the timing of these injuries suffered by Kaceston coincides with the time when Defendant had sole custody of Kaceston, and thus, we find that the State provided sufficient evidence that Kaceston's fatal injuries were the result of child abuse inflicted when Defendant had sole custody of Kaceston. Therefore, when viewing the evidence in light most favorable to the prosecution, we find the State's evidence sufficient for the conviction of the Defendant.

*Hypothesis of innocence:*

By law, in cases where the evidence is mostly circumstantial, such as this matter, the State is required to exclude any reasonable hypothesis of innocence. Here the Defendant argues that, in the days and weeks before his murder, Kaceston was in the company of many other people, including his mother

and grandmother, a young family member who was known to be a problem child, and his grandmother's husband, who is a three-time convicted felon; and further that no one at the house or any of the doctors noticed Kaceston's injuries or signs of abuse. We find Defendant's argument that no one at the house or any of the doctors noticed Kaceston's injuries or signs of abuse is unconvincing and contrary to the evidence in the record. Specifically, the medical testimony at trial established that Kaceston's injuries would not have necessarily entail any obviously suspicious external injuries for a person to observe or a medical doctor/examiner to disclose and report. Additionally, the evidence shows that numerous witnesses, including Defendant himself, testified or were recorded stating that they noticed the symptoms of Kaceston's abdominal injuries commencing on or after July 6, 2022, along with the evidence of Defendant's internet searches indicating that he noticed the symptoms of the head injury the night of July 20, 2022, both dates Kaceston was in the sole custody of Defendant.

We further find Defendant's argument and hypothesis of innocence that he was not the only person with the opportunity to inflict the injuries sustained is also unsupported and unconvincing. Specifically, the timing of when Kaceston began presenting with the relevant symptoms combined with the lack of previous incidents when Kaceston was in the care of others, as well as the amount of force that would have been necessary to inflict the injuries relative to the other potential caregivers, all contradicts this argument by Defendant. We find Defendant's argument, that a different caregiver possibly inflicted the head injury, is even more implausible, particularly when the evidence of Defendant's own internet searches indicates these injuries most likely occurred when he was the only adult present on July 20, 2022. Thus, we find the "precise timing" of Kaceston's injuries, as well as a lack of any prior suspicious incidents makes the Defendant's alleged hypothesis

33

of innocence that someone else inflicted the mortal injuries to Kaceston to be unreasonable and unsupported by the evidence.

*Similar jurisprudence:*

Finally, our review of similar relevant jurisprudence supports the conclusion that the State proved the elements of the offense of second degree murder beyond a reasonable doubt. In the case of *State v. Cohen*, 18-297 (La.App. 3 Cir. 5/8/19), 272 So.3d 12, *writs granted,* 19-949 (La. 6/22/20), 297 So.3d 762, *rev'd on other grounds*, 19-949 (La. 1/27/21), 315 So.3d 202, this court upheld the sufficiency of circumstantial evidence as to a second degree murder conviction when a baby sustained various non-accidental blunt force traumas to the head, chest, abdomen, and back, in various states of healing, during a time frame when defendant had near sole custody and when defendant gave contradictory statements. In *Porter*, 761 So.2d at 115, the sufficiency of second degree murder conviction was upheld when a child sustained extensive non-accidental injuries while alone with a defendant, who claimed the child slipped and fell in a bathtub after defecating in said tub, and when defendant consciously refused to seek medical attention for the child's injuries.

In summary, when viewing the evidence in light most favorable to the prosecution, we find the evidence more than sufficient to support the jury's unanimous verdict finding Defendant guilty of second degree murder of Kaceston A. Freeman. Therefore, Defendant's assignment of error, as to lack of sufficiency of evidence, is without merit.

## PRO SE ASSIGNMENT OF ERROR

For his pro se assignment of error, Defendant alleges that the State erred by referring to him as "someone who is currently running around selling drugs with a

34

kid in the car." Defendant argues that this remark by the State served no purpose and was prejudicial to his case in violation of La.Code Crim.P. art. 770.

While this court granted Defendant's pro se motion to extend the submission deadline for the filing of his pro se brief to February 28, 2025, we note Defendant's brief was post-marked on March 6, 2025, and thus, not timely filed for this appeal. Regardless, we will analyze this claim.

The relevant portion of the transcript as to this issue is as follows:

Q      Okay. And they keep mentioning about the step-grandfather and his, you know, he's a felon from 2009. I mean is that -- do you think that is more significant than somebody currently running around selling drugs with a kid in the car?

[Defense]:

Objection.

[State]:

I mean I'm just asking about time. I mean it's all relative, you know, if somebody had this - -
[Defense]:

Objection.

[State]:

-- conviction --

The Court:

Sustained.

Here, and although the defense counsel lodged a general objection to the State's remarks, no specific reason for the objection was provided to the trial court. The specific grounds for an objection must be stated to preserve the issue for review. La.Code Crim.P. art. 841. Additionally, and most relevant to this issue, the trial court *granted* and sustained the defense counsel's objection; however, the Defendant requested no further remedy. A defendant cannot complain on appeal

35

of an alleged error when an objection to the error was sustained and no request for mistrial or admonition is made at trial. *State v. Michel*, 422 So.2d 1115 (La.1982) (citing *State v. Miles*, 402 So.2d 644 (La.1981)).

Accordingly, this assignment of error is without merit.

## **DECREE**

We affirm Christopher Ledet, Jr.'s conviction and sentence. We further instruct the trial court to amend and correct the sentencing minutes, and the Uniform Commitment Order, to accurately reflect that Defendant was sentenced to life imprisonment at hard labor without the benefit of parole, probation, or suspension to sentence, and to provide Defendant with notice of said corrective action.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules — Courts of Appeal, Rule 2-16.3.